## ANDREWS v. CHASE et al.

No. 5504.  Decided September 25, 1935.  (49 P. [2d] 938).

*Allen T. Sanford* and *E. A. Rogers,* both of Salt Lake City, for appellant.

*Van Cott, Riter & Farnsworth, Cheney, Jensen & Marr,* and *Ray McCarty,* all of Salt Lake City, for respondents.

ELIAS HANSEN, Chief Justice.

In the court below defendants' demurrers to plaintiff's amended complaint were sustained. Plaintiff refused to further amend his complaint, whereupon defendants moved to dismiss the action. The motion was granted and the action dismissed. Plaintiff appeals. He assigns as errors the order sustaining the demurrers and the order dismissing the action. It is in substance alleged in the complaint: That defendant companies are, and at all times alleged in the complaint were, Utah Corporations; that plaintiff is, and at all times alleged in the complaint was, a statistician, analyst, and adviser of the value of stocks, bonds, and various kinds

of securities and as such engaged in business at Salt Lake City, Utah; that at the times complained of plaintiff had a list of numerous clients to whom he was, and for two years had been, sending weekly letters advising them of his opinion and analysis of mining stocks and other securities; that during the month of April, 1932, defendant Ogden C. Chase was a director, secretary and treasurer, and defendant S. F. Hunt was a director and the president, of defendant corporation Rio Tinto Copper Company. Paragraph 4 of the amended complaint contains the allegations which form the basis for the questions which divide the parties. We quote it in full:

"That on or about the 1st day of April, 1931, the said defendant Rio Tinto Copper Company, was desirous of giving some of its shares of treasury stock to such members of the public as would receive it, upon the understanding that the Rio Tinto Copper Company would for the purpose of carrying on development of said property levy one two-cent assessment and three one-cent assessments, or as many thereof as might be necessary to finance the development of its mining property and with the understanding that the persons receiving said stock were not obligated to pay such assessments, or any of them, and on or about said date the said Rio Tinto Copper Company and the said Ogden C. Chase and said S. F. Hunt, knowing that the said plaintiff had a large number of clients residing outside of Utah who reposed confidence in the judgment of the plaintiff and who relied upon the advice of the plaintiff with reference to the value of mining stocks and other securities, entered into an agreement with the said plaintiff wherein and whereby the said defendants, Rio Tinto Copper Company, Ogden C. Chase and S. F. Hunt, agreed to and with the plaintiff that if the plaintiff would assist the said Rio Tinto Copper Company in placing its treasury stock with his clients residing outside of Utah upon the aforesaid basis, the said defendants, Rio Tinto Copper Company, Ogden C. Chase, and S. F. Hunt, would transfer, convey, and deliver to the plaintiff 20,000 shares of the Class A capital stock of the said Rio Tinto Copper Company after the aforesaid assessments or as many thereof as might be necessary, had been levied and paid; that the said Rio Tinto Copper Company levied one two-cent assessment and three one-cent assessments, assessment No. 4 having been levied on or about the 17th day of March, 1932, and the collection of said assessment having been consummated on or about the 17th day of May, 1932; that pursuant to said agree-

ment the plaintiff immediately commenced upon said work, circularized his said clients frequently and wrote personal letters to about one hundred twenty-five of his clients, such circulars and letters all having been delivered outside of Utah, recommending the acquisition of the said stock of the said Rio Tinto Copper Company upon the aforesaid basis, and as a result of the efforts of the plaintiff approximately 145,000 shares of stock were accepted by plaintiff's customers; that the plaintiff duly performed all things in said contract upon his part to be performed."

It is further alleged in the complaint that in October, 1932, defendant Mountain City Copper Company acquired all of the assets and property of the defendant Rio Tinto Copper Company, and in consideration therefor agreed to exchange its stock share for share to the stockholders of the Rio Tinto Copper Company and to assume all contracts and liabilities of the Rio Tinto Copper Company; that plaintiff has made demand of defendants that they issue to him the 20,000 shares of stock which they agreed to convey to him, but defendants have failed and refused, and continue to refuse, to deliver the stock. Plaintiff prays judgment that defendants deliver the stock, or, if delivery thereof cannot be had, that he be awarded judgment for the value thereof.

One of the principal questions of law upon which the parties divide is whether or not the alleged agreement relied upon by the plaintiff is or is not void. Defendants contend that the alleged agreement was and is unenforceable and void because inhibited by the provisions of Laws of Utah 1925, c. 87, p. 171, which act is sometimes referred to as the Securities Act, and is commonly known as "the Blue Sky Law." Plaintiff contends that the agreement pleaded in his complaint did not involve a sale, and therefore was not within the provisions of the act.

In the main, the present law touching the matter in hand is the same as it was at the time plaintiff alleges that he entered into the agreement sued upon. Rev. St. Utah 1933, title 82, chap. 1, p. 981 (82-1-1 et seq.). We quote from chapter 87, Laws of Utah 1925, such provisions of the act as we deem bear upon this controversy:

"When used in this Act the following terms shall, unless the text otherwise indicates, have the following respective meanings: * * *

" 'Sale' or 'sell' shall include every disposition, or attempt to dispose, of a security or interest in a security for value. Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase, and to have been sold for value. 'Sale' or 'sell' shall also include an exchange, an attempt to sell, an option of sale, a solicitation of sale, a subscription or an offer to sell, directly or by an agent, or a circular, letter, advertisement or otherwise.

" 'Dealer' shall include every person other than a salesman who in this State engages either for all or part of his time directly or through an agent in the business of selling any securities issued by another person or purchasing or otherwise acquiring such securities, from another for the purpose of reselling them or of offering them for sale to the public, or offering, buying, selling or otherwise dealing or trading in securities as agent or principal for a commission or at a profit, or who deals in futures or differences in market quotations of prices or values of any securities or accepts margins on purchases or sales or pretended purchases or sales of such securities provided that the word 'dealer' shall not include a person having no place of business in this State who sells or offers to sell securities exclusively to brokers or dealers actually engaged in buying and selling securities as a business.

" 'Issuer' shall mean and include every person who proposes to issue, has issued, or shall hereafter issue any security, Any natural person who acts as a promoter for and on behalf of a corporation, trust or unincorporated association or partnership of any kind to be formed shall be deemed an issuer.

" 'Salesman' shall include every natural person, other than a dealer, employed or appointed or authorized by a dealer, or issuer to sell securities in any manner in this State. The partners of a partnership and the executive officers of a corporation or other association registered as a dealer shall not be salesmen within the meaning of this definition." Section 2.

"All securities required by this Act to be registered before being sold in this State, and not entitled to registration by notification shall be registered only by qualification in the manner provided by this section." Section 7.

"No dealer or salesman shall engage in business in this State as such dealer or salesman or sell any securities including securities exempted in Section 3 of this Act, except in transactions exempt under Section 4, of this Act unless he has been registered as a dealer or

salesman in the office of the commission pursuant to the provisions of this section." Section 10.

"Any person, issuer, dealer, agent or salesman, who, not being at the time exempt or registered pursuant to the provisions of this Act, in any manner or by any means shall issue, sell, assign, transfer or offer to or negotiate for the issuance, sale or assignment, or transfer, of any securities said securities not being exempt or registered at the time of such issuance sale assignment or transfer, pursuant to the provisions of this Act, shall be guilty of a felony and upon conviction thereof shall be punished by a fine of not less than $100.00 or more than $10,000.00, or by imprisonment in the State prison for a term of not more than ten years, or by both such fine and imprisonment." Section 27.

The stock here involved is not one of the kinds of securities which are exempt from the provisions of the Securities Act. Appellant does not contend otherwise. What he does contend is that the act merely regulates the sale of securities and has no application whatever to securities which are given away. It will be observed that "sale or sell" is defined as every disposition, or attempt to dispose, of a security or interest in a security for value. The words "for value" are descriptive of, and constitute a limitation on, the kind of transactions which the Securities Act was intended to regulate. It is a cardinal rule in the construction of a statute that, when possible, effect must be given to all of the language used in an act. If the Legislature had intended that the words "sale or sell" should include "gift or give," it would not have limited the former words to such disposals, or attempted disposals of securities as are made for value. The second sentence of section 2, subd. 3, further indicates a legislative intention to limit the act to transactions where securities are disposed of for value. It provides that, if one security is transferred for value and another shall be given or delivered as a bonus, the latter "shall be conclusively presumed to constitute a part of the subject of such purchase." The provision of the act last quoted was evidently intended to prevent evasion of the act by one or more of the parties to a transaction involving

the transfer of security from contending that such transfer was a gift in a transaction where the transferor may have received value for the stock disposed of by him. Had the lawmaking power intended that the act should apply to gifts of securities, it would have been a simple matter to have so provided. In such case there would have been no occasion for the provision with respect to the giving or delivering of security as a bonus "on account of, any purchase of securities or any other thing," being "conclusively presumed to constitute a part of the subject of such purchase."

It will also be observed that the provisions of the act defining a dealer, an issuer, and a salesman are confined to those who have to do with the disposal of securities by means of a sale, and is silent as to such persons as may participate in the disposal of securities by gift. So also the only securities which the act requires to be registered are such as "shall be sold within this State." Section 5. To hold that the act applies to securities which are given away would be to read into the act a meaning which is not expressed or implied by the language used. On the contrary, the clear implication to be drawn from a number of the provisions of the act is that gifts of securities were not intended to be covered by the act.

It will be noted that it is in substance alleged in the complaint that plaintiff was employed to assist in giving the stock of the defendant Rio Tinto Copper Company to such members of the public as were willing to accept it; that the stock was so given with the understanding that the company would levy assessments for the development of its mine, but that the persons securing the same were under no obligation to pay such assessments. It is contended by respondents that in giving away the stock with the knowledge that assessments would be levied thereon, and with the hope that such assessments would be paid by the donees, was, within the meaning of the Securities Act, an attempt to sell the stock. If, in the transaction under review, the transferees had agreed to pay the future

assessments when levied, it would seem reasonably clear that the transaction would have been a sale. The allegations of the complaint, however, alleged that there was no such agreement. In the absence of an agreement to pay assessments, the transferees of the stock were not obligated to pay the assessments. The law is settled in this jurisdiction that, when the articles of incorporation provide that the stockholders thereof shall not be liable for the corporate debts, the owner of full paid stock of such corporation is not liable for an unpaid assessment. The only means of enforcing the assessment is by a sale of the stock or so much thereof as may be necessary to pay the assessment. *Dotson* v. *Hoggan,* 44 Utah 295, 140 P. 128. In light of the allegations of the complaint that the persons to whom the stock was given assumed no liability to pay assessments, it is to be assumed the articles of incorporation of the defendant Rio Tinto Copper Company contain a provision that the stockholders thereof were not liable for its debts. Such a provision is usually contained in the articles of incorporation of mining companies. If the allegations of the complaint are true, which we must assume for the purpose of demurrer, it follows that there was neither a sale nor an attempt to sell the stock in question. A mere hope or anticipation that the transferees of the stock would pay the assessments if and when levied may not be said to be a disposition or an attempt to dispose of the stock for value within the meaning of the act. A gift does not become a sale merely because the donor hopes to receive something for the gift.

Counsel for the respective parties have at considerable length argued two other questions, viz.: Assuming the transaction alleged in the complaint was a sale within the meaning of the Securities Act, may the defendants avail themselves of such fact to escape liability? Was the transaction alleged in the complaint interstate commerce and as such not subject to the provisions of the Act? Having reached the conclusion that the transaction as alleged by plaintiff is not covered by the provisions of the Securities Act, it be-

comes unnecessary to determine the other questions presented. We therefore express no opinion concerning them. From what has been said, it follows that the judgment dismissing the action should be, and it accordingly is, reversed.

This cause is remanded to the district court of Salt Lake county with directions to reinstate the action and overrule the demurrers. Appellant is awarded his costs.

FOLLAND, MOFFAT, and WOLFE, JJ., concur.

EPHRAIM HANSON, Justice (dissenting).

I am unable to concur either in the views expressed in the prevailing opinion or in the results therein reached. Hence this dissent.

As stated in the prevailing opinion, the demurrers of the defendants to the complaint were sustained. The plaintiff having elected to stand on his complaint, the case was dismissed. Plaintiff appeals. The issues on this appeal are therefore determined by the sufficiency of the allegations of the complaint.

It is assumed by the plaintiff, and also by the prevailing opinion that it is alleged in the complaint that the defendants were making gifts of the capital stock of the Rio Tinto Copper Company to such members of the public as would accept the same. In my opinion, the allegation of the complaint does not justify such conclusion. The complaint merely asserts that the copper company

"was desirous of giving some of its shares of stock to such members of the public as would receive it upon the understanding that the Rio Tinto Copper Company, would for the purpose of carrying on development of said property levy one two-cent assessment, and three one-cent assessments, or as many of these as might be necessary to finance the development of its mining property and with the understanding that the persons receiving said stock were not obliged to pay such assessments or any of them."

Nowhere is there any allegation of any intention to make a gift, nor is there any allegation from which such intention

may be inferred; nor is there any allegation from which it may be inferred that any kind of delivery of the stock would be made prior to the payment of the assessments to be levied. It is inconceivable to assume that the stock certificates would be executed and issued promiscuously to any and every person who might be on plaintiff's mailing list, or to whom a certificate could be sent by the simple process of depositing the same in the mails. The fair inference is that, if stock certificates were issued at all, they were only issued to those particular persons who would accept the same, knowing that they would have to pay as much as five cents per share if they were to keep the stock. Even such an arrangement could in no sense be distorted into a gift, granting a sufficient delivery, as there would still be lacking the necessary intention by the copper company to make a gift.

"A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift inter vivos. And this intention must be inconsistent with any other theory." 28 C. J. 627, § 19.

The only word in the complaint which might characterize the transaction as a gift is the word "giving." This word has no fixed and definite meaning, so that the mere use of it would necessarily make a sufficient allegation of the ultimate fact of a gift. While the primary meaning of the word "give" is to bestow a gratuity, yet it also has a secondary meaning, widely and frequently employed in ordinary business and other transactions. In *Smith* v. *Burnet,* 35 N. J. Eq. 314, at page 324, the court says:

"The question arises whether it appears that such possession was delivered with an intention to confer upon him dominion over the stock as the absolute owner thereof. Proof of such an intent is absolutely essential to support the gift. * * * The word 'give' is often used with other meaning than as evincing an intent to confer the title in the thing delivered."

In *Johnston* v. *Griest,* 85 Ind. 503, the plaintiff sued upon a writing which read:

"This will certify that I do give to Charles E. Johnston $100, the money to be paid as soon as my financial condition will allow; and if I do not live to pay it, I wish it paid out of my estate."

This was held to be a promise to make a gift and not a promise to pay. The court said:

"The word 'give' does not always signify a mere gratuitous act; at all events it is not one of those words which have a fixed and unalterable meaning."

*Galloway* v. *Jenkins,* 63 N. C. 147; *Spencer* v. *Potter's Estate,* 85 Vt. 1, 80 A. 821. In *Revere Oil Co.* v. *Bank of Chillicothe* (Tex. Civ. App.) 255 S. W. 219, and in *Southern Express Co.* v. *State,* 1 Ga. App. 700, 58 S. E. 67, the words "giving" and "give" were construed to be synonymous with "delivering" and "deliver" respectively.

In *Crews* v. *Crews* (Mo. Sup.) 240 S. W. 149, 151, it was contended that the word "give" in a will permitting the executrix to "give such of my children at such time as she may think proper such of my property as she may think just and right," necessarily implies a gratuity. The court said:

"Such, however, is not the case. Even if the word 'give' does generally mean a gift or gratuity, it depends entirely upon the circumstances and the context as to whether that meaning should be attached to it. The word is used to mean 'deliver,' 'supply,' 'grant,' 'furnish,' 'pay,' 'convey.' * * * We have been unable to find any case where it is held that the term necessarily implies a gratuity or a gift without consideration. On the other hand, there are cases where it is held that it does not necessarily imply want of consideration. * * * The word must be considered in the light of circumstances."

As a further aid to the proper construction of the complaint, the provisions of our Constitution and statutes relative to the issuance of corporate stock should be considered. Article 12, § 5, of our Constitution provides:

"Corporations shall not issue stock, except to bona fide subscribers thereof or their assignee. * * * All fictitious increase of stock or indebtedness shall be void."

The clear purpose of this provision is to prevent the issuance of "watered stock" and to assure that no corporate stock will be issued without receiving something of value therefor. The import of plaintiff's complaint and his contentions before this court are that the persons receiving the copper company's stock were in no sense subscribers thereto. Indeed, a donee of stock from the corporation could not be a bona fide subscriber therefor. In the case of *Frame* v. *Mahoney*, 21 Ariz. 282, 187 P. 584, 586, the Arizona Supreme Court construed a provision of the Arizona Constitution identical with ours. It said:

"A bona fide subscriber is one who actually turns over to the corporation something of value in lieu of the stock issued to him."

In a later case, *Overlock* v. *Jerome-Portland Copper Min. Co.*, 29 Ariz. 560, 243 P. 400, 401, the same court, after quoting the same constitutional provision, says:

"A proper construction of the language quoted doubtless would be that the stock in the hands of Frame should be annuled, since he paid nothing for it and was not a bona fide subscriber. * * * The evident purpose of the clause, which says, 'No corporation shall issue stock, except to bona fide subscribers therefor or their assignees,' was to prevent the issuance of stock except to parties who paid for it at its face value, and was intended more for the protection of creditors of the corporation than otherwise. This same provision is found in the Constitutions of Washington and Utah, and if we rightly understand their courts, that is their view. *Gordon* v. *Cummings*, 78 Wash. 515, 139 P. 489; *Rolapp* v. *Ogden, etc.*, R. Co., 37 Utah 540, 110 P. 364."

The Constitution of the state of Washington also contains a provision identical with our provision above quoted. In the case of *Gordon* v. *Cummings*, 78 Wash., 515, 139 P. 489, 494, the court of that state held that the

"holders of unpaid stock cannot defeat an action for the balance due by claiming that they hold such stock as a mere gratuity."

The court further says:

"Indeed it seems to us that the framers of the constitution of this state anticipated, and intended to prevent, just such frauds on the law

as was here attempted. 'Corporations shall not issue stock, except to bona fide subscribers therefor, or their assignees.' Article 12, § 6. If this means anything, it is that one who takes the stock of a corporation is liable for its value and that a subscription that is not made in good faith is no subscription. * * *

"Within the limit of the authorized capital stock, no person can hold a share of the stock, by whatever name it may be called, without meeting the responsibilities and the liabilities that the law attaches to such holding. To hold otherwise would defeat the very purpose of the law; for it would then be possible, by adopting the very plan that was adopted in this case, to make all but a nominal number of the shares of the capital stock unresponsive to the liability put upon it by law."

This court in the case of *Rolapp* v. *Ogden & N. W. R. Co.*, 37 Utah 540, 110 P. 364, has indicated a construction of our constitutional provision and the statutes of the state in harmony with the foregoing principles. After quoting said provision and referring to those sections of our statutes which are now sections 18-2-6, 18-2-7, and 18-2-13, Rev. St. Utah 1933, Mr. Justice Frick says:

"If we keep in mind all of our own constitutional and statutory provisions, we think it is manifest that it was the intention both of the people who adopted the Constitution and the Legislature who passed the foregoing sections that the capital stock of corporations excepting those created for mining and irrigation, shall represent full actual value either in money or property, and further, that the subscribers for stock shall pay 100 cents on the dollar, or its equivalent, for the stock subscribed for by them, and until so paid that they are liable to creditors of the corporation in a proper proceeding for any balance remaining unpaid on their subscriptions. No doubt when stock is once 'full paid,' whether in money, property, or labor, it may be bought and sold at any price, but commercial or business corporations in this state may not issue stock to their subscribers for less than the face value thereof, which must be paid for, either in money or property."

Fletcher, in Cyclopedia of Corporations, vol. 11, § 5202, says:

"For a corporation to issue its stock as a gratuity violates the rights of existing stockholders who do not consent, and is a fraud upon subsequent subscribers, and upon subsequent creditors who deal with it on the faith of its capital stock."

It is clear that the issuance and delivery of its corporate stock by a corporation gratuitously and without any consideration violates the constitutional and statutory provisions of this state. Under plaintiff's theory, all of the copper company's capital stock could have been given away, development work done, and debts incurred with no one liable or responsible for the obligations thus incurred. Such a proceeding would be, in my opinion, directly contrary to the law of this state. It is not necessary for us to determine, in this case, however, what the legal effect of such violation would be as between the holders of stock and others. It is sufficient to note that plaintiff's theory is based entirely upon such a violation on the part of the copper company, and he is asking us to give his complaint that effect. It is elementary that an agreement will not be construed as involving the performance of something forbidden by law when it is open to a construction that does not involve such violation. As I have already stated, the complaint here in question does not allege a gift by appropriate and sufficient allegations as to either of the essential elements of intention or delivery, and it is not within our province to make any inferences that would lead to a result which the law prohibits. We must assume, therefore, that the defendants were disposing, or attempting to dispose, of the stock of the copper company for value. Consequently, it is my opinion that the word "giving" must be construed, not as indicating a gratuity, but as synonymous with "delivering."

In view of the foregoing conclusions, it becomes necessary to consider the word "assessment" as used in the complaint. The transactions involved in the complaint occurred in 1931 and 1932, before the enactment of the Revised Statutes of 1933. The plaintiff and the prevailing opinion assume that this word, as used in the complaint, necessarily refers to assessments levied on full paid stock. However, that is not the case. The provisions of sections 900, 901, 902, and 905, Comp. Laws Utah 1917, as amended in the 1921 Session

Laws, c. 22 p. 71, and sections 903, 904, and 919, Comp. Laws Utah 1917, were then in effect. The word "assessment" is there used to denote a "call" upon subscribed and unpaid stock as well as an assessment on full paid stock, and the same procedure is provided for the collection of both kinds of "assessments." In either case the stock may be sold to pay the assessment. Stock thus sold passes to the purchaser or the corporation, as the case may be. As to an "assessment" on unpaid stock, at least, under section 919, the company can waive the sale and sue to collect the delinquent "assessment." The corporation has the option to sell the stock or proceed by suit to collect on the promise to pay. Having such option, it could agree with a subscriber that it would look exclusively to the sale, and no express or implied promise to pay the "assessments" need be made. 14 C. J. 537, § 803. A sale and forfeiture of the stock would preclude any action against the subscriber under such conditions. 14 C. J. 650, § 989. Rev. St. 1933, 18-4-1 et seq., makes the distinction between "calls" and "assessments" and uses the words in their respective meanings. It will also be noted that section 919 is omitted entirely, and that on a sale of stock for a "call" the purchaser becomes liable for the subsequent and unpaid "calls."

Since the word "assessment" has a dual meaning, as indicated and since admittedly no consideration for the stock was to be given at the time plaintiff's customers should indicate their willingness to accept it, or even after it was delivered, if delivered before the assessments were levied, and since no gift of title to the stock can be inferred from the allegations of the complaint, it necessarily follows that the "assessments" contemplated were in effect "calls," which the copper company was authorized to make and which the holders of the stock must pay to obtain and keep title thereto. This conclusion is borne out by an analysis of the complaint. The "assessments" are limited to four in number, and each is for a particular amount. As to creditors, at least, the company could not agree in advance that

upon the issue of fully paid but assessable stock it would or could levy only certain specified assessments. Especially would this be true where such agreement was made with only certain persons who acquired the assessable stock. It is not to be inferred from the complaint that the only persons who acquired the assessable stock of the copper company were those who had this understanding concerning these four assessments. There is nothing in the complaint that would warrant the conclusion that the copper company was disposing of its assessable stock only through the method by which plaintiff operated. It is not shown that his assistance or employment was exclusive and that the assessable stock was not to be disposed of by other means. In my opinion, however, it must be inferred that the four stipulated assessments were to be levied only on the stock issued or to be issued according to said understanding under which plaintiff operated. The only legitimate construction that can be placed upon the arrangement thus pleaded, therefore, is that upon the payment of these "assessments" or "calls" the stock would be deemed fully paid for.

From what has been said it is clear that the disposition of the copper company's stock, as alleged, would be a sale for value within the definition of that term as stated in chapter 89, Laws of Utah 1925, as amended by chapter 79, Laws of Utah 1929, commonly called the Blue Sky Law. Certainly such disposition was an attempt to dispose of a security for value. It may be conceded that a gift of stock does not come within the purview of the Blue Sky Law. But, as herein shown, to call the arrangement described in the complaint a bestowing of gratuitous issues of stock, is begging the question and fails to distinguish between form and substance. If this court gives legal sanction to such a plain and palpable attempt to evade the intent and purpose of our constitutional and statutory provisions, then indeed will the doors be wide open to every one who may resort to the specious expedient of making "gifts" of stock. The law would be nullified; the legislative regulations intended to

protect the public would be inoperative; and additional impetus would be given to the ever present tendency to invent means to circumvent such regulations.

It must be conceded that the stock here involved is not exempt from the provisions of the Blue Sky Law. Before it could be sold, as defined by the law, it must have been registered with the State Securities Commission. There are no allegations in the complaint showing that the stock disposed of was so registered.

It does not appear from the complaint that the plaintiff was a dealer as defined by chapter 79, Laws of Utah 1929. But it is alleged that plaintiff was to "assist the said Rio Tinto Copper Company in placing its treasury stock with his clients residing outside of Utah" upon the basis heretofore explained; that, as a result of plaintiff's efforts, approximately 145,000 shares of stock were accepted by his customers. Under such allegations he would come clearly within the definition of "agent"; it being established that the transactions thus involved constituted "sales" within the statutory definition. Under section 10x, c. 79, Laws Utah 1929,

"no person shall engage in business in this State as such agent to sell any securities of an issuer as set forth in this Act unless he has paid a fee of five dollars ($5.00) and has been registered as an agent in the office of the commission pursuant to the provisions of this chapter. Every agent before selling, offering to sell or advertising the sale of any security of an issuer under the provisions of this Act shall file in the office of the commission an application for registration in writing," etc.

Section 27 of chapter 87, Laws of Utah 1925, makes it a felony for an unregistered dealer, salesman, or agent to sell, or offer for sale, or negotiate for the sale of, unregistered securities.

Plaintiff is suing for the compensation he claims he earned in assisting in the disposition of the copper company's stock. He does not allege that he was registered as required by the provisions above quoted. In my opinion,

having failed to allege that the stock which plaintiff assisted in disposing of was not registered, and having failed to allege that he himself was registered, plaintiff has failed to state a cause of action.

The Blue Sky Law was enacted for the protection of the public. It specifically provides that corporate securities must be registered before being sold or offered for sale, and every dealer, salesman, or agent must be registered before selling or offering to sell such securities. Selling unregistered securities by an unregistered person is made a felony. Even though the statute does not expressly so provide, it must follow that any contract which plaintiff may have had with defendants made in violation of such provisions is utterly void. *Neil* v. *Utah Wholesale Grocery Co.*, 61 Utah 22, 210 P. 201; *Levinson* v. *Boas*, 150 Cal. 185, 88 P. 825, 12 L. R. A. (N. S.) 575, 11 Ann. Cas. 661; *Payne* v. *De Vaughn*, 77 Cal. App. 399, 246 P. 1069; *McKinlay* v. *Javan Mines Co.*, 42 Idaho 770, 248 P. 473; *McManus* v. *Fulton*, 85 Mont. 170, 278 P. 126, 130, 67 A. L. R. 690; *Zerr* v. *Lawlor* (Tex. Civ. App.) 300 S. W. 112; *Brandenburg* v. *Miley Petroleum Exploration Co.* (D. C.) 16 F. (2d) 933. To permit plaintiff to recover in this case would be to give legal sanction to, and enforce, an illegal contract. This the courts will not do. They will not aid either party to such a contract. Though it may be said that it illy becomes a defendant to take advantage of such illegality, yet such defense is allowed, and the courts, even sua sponte, will take cognizance thereof, not for the benefit of either party, but for the public good and for the maintenance of their own dignity and the laws of the state. As stated by the Supreme Court of the United States in the case of *McMullen* v. *Hoffman*, 174 U. S. 639, 19 S. Ct. 839, 851, 43 L. Ed. 1117:

"To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they entered into contracts of this nature they place themselves outside the protection of

the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

Because section 18, c. 79, p. 140, Laws of Utah 1929, amends the original act and makes a sale in violation of the act voidable at the election of the purchaser, can be of no assistance to plaintiff in this case. His rights do not depend upon whether the purchaser may or may not make such election. As stated in *McManus* v. *Fulton,* supra:

"The provisions that the sale shall be void at the election of the purchaser does not in any wise detract from the criminal character of the prohibited act on part of the seller. * * * Under the law a contract between the seller and the purchaser was voidable at the option of the purchaser; but that has no relation whatever to a contract between the issuer and the agent, solicitor, or broker, or between the agents of the issuer; such, in the absence of a compliance with the Act, is wholly void."

Plaintiff seeks to avoid the effect of the foregoing principles by arguing that the sales of stock took place outside the state of Utah and were made in interstate commerce, and therefore were not subject to our Blue Sky Law. As to the first contention, it is utterly impossible to conclude from the allegations of the complaint that the sales were actually made outside the state of Utah. All that appears is that plaintiff's customers resided outside this state and that his correspondence went beyond its boundaries. Plaintiff simply advised his customers and assisted in the sales. The inference is that, after being advised by plaintiff to accept the stock, his correspondents made some kind of communication with the copper company, indicating a desire to accept a certain amount of its stock. The company's office was here. It would here determine whether to accept such application, so that the last act necessary to complete the contract would necessarily occur here. This would make it a Utah contract. *United States Bond & Finance Corpora-*

*tion* v. *National Bldg. & Loan Ass'n,* 80 Utah 62, 12 P. (2d) 758, 17 P. (2d) 238.

Such a transaction would not necessarily be one in interstate commerce. Plaintiff's solicitations and advisory letters formed no part of the sale contract. They were simply the procuring cause which induced the making of the contract and the consequent sale. For plaintiff to avoid the effect of the laws of this state under the theory that what he did and what was done between his customers and the copper company involved interstate commerce, it was his duty to allege sufficient facts to bring himself within the principles thus sought to be invoked. There are no such allegations in the complaint now before us, even assuming that corporate stock is an article subject to interstate commerce, a question not herein decided. There are no allegations as to when or where delivery of the stock was made or that the sales necessarily involved the use of interstate commerce to complete the same. It is therefore not necessary to discuss further this phase of the case. It is my opinion that the trial court committed no error in sustaining defendants' demurrer to plaintiff's complaint and in dismissing such complaint upon plaintiff's failure to further plead. The judgment of the trial court, therefore, should be sustained.

### ADDENDUM.

ELIAS HANSEN, Chief Justice.

The view is expressed in the dissenting opinion of Mr. Justice Ephraim Hanson that the complaint is fatally defective in that it affirmatively appears that the alleged transaction relied upon by plaintiff for recovery contravenes the provisions of article 12, § 5, of the Constitution of Utah, and certain statutory provisions calculated to give effect to such constitutional provisions. The argument is made that the Rio Tinto Copper Company was, as a matter of law, precluded from giving away any of its treasury stock. That

such is the law generally may readily be conceded. It is, however, an easy matter to conceive of exceptions to the general rule. An illustration will serve to make clear what we have in mind. Thus, if owners of mining property desire to create a corporation for the purpose of developing their property, and, instead of having issued to themselves shares of capital stock of the corporation in payment for mining claims conveyed to the corporation, they conclude, and so provide in the articles of incorporation, that some of the stocks shall be held by the corporation and later given away as directed by the incorporators, such an arrangement may not be said to offend against the provisions of the Constitution or the laws referred to in the dissenting opinion. In such case neither the corporation nor the creditors thereof would have any just cause to complain because the stock was transferred to the donees rather than to the incorporators. Plaintiff, in the absence of a showing to the contrary, had a right to assume that the defendant Rio Tinto Copper Company had authority to perform its alleged contract. The complaint here brought in question is silent as to what was or what was not contained in the articles of incorporation of the defendant Rio Tinto Copper Company at the time complained of. Courts do not take judicial notice of such matters. If the defendants, or either of them, desire to interpose the defense that the defendant Rio Tinto Copper Company was without authority to enter into the alleged contract here sued upon, they may do so by answer. The complaint does not affirmatively show that such a defense is available to defendants.

Moreover, this action was brought against the personal defendants Ogden C. Chase and S. F. Hunt as well as the corporation defendants. It is alleged in the complaint that the contract sued upon was made with the Rio Tinto Copper Company, Ogden C. Chase, and S. F. Hunt. The mere fact that the defendant Rio Tinto Copper Company may be precluded from giving away its stock would not preclude plaintiff from recovering, from the personal defendants, com-

pensation for services lawfully rendered pursuant to the contract of employment. Even though the defense of ultra vires is available to the defendant company, it is difficult to perceive how such a defense is available to the individual defendants. The contract declared on is for services alleged to have been rendered and not for the enforcement of a promise to make a gift. No provision of law would be broken and no public policy would be infringed by the individual defendants paying plaintiff for lawful services. If, therefore, the purposes sought to be accomplished by the contract of employment were lawful, the individual defendants would not be relieved from liability merely because the defendant company may have exceeded its authority in entering into the alleged contract. In this connection it may be noted that the defendants do not attack the complaint either by their demurrer or in their briefs upon the ground that the complaint shows on its face that the defendant Rio Tinto Copper Company exceeded its authority in entering into the alleged contract of employment.

The position is also taken in the dissenting opinion that the allegations in the complaint do not affirmatively show that no consideration was to be paid for the stock other than, and in addition to, the allegations with respect to the levy of future assessments. Apparently counsel for the respondents do not so construe the allegations of the complaint. The cause was argued on the theory that the transaction set out in the complaint constituted a gift unless the allegations with respect to the understanding as to future assessments made it otherwise. Counsel for the parties having so construed the complaint and having based their argument on such construction, we should dispose of the question presented for review upon such theory, unless the language of the complaint demands a different construction. Moreover, plaintiff was not required to negative the possibility that the contract sued upon is beyond any attack that may be urged against it upon the ground that it is illegal. Where a contract is shown to have been entered into, it will

be presumed to be binding upon the parties unless it affirmatively appears otherwise.

"Where the language of an instrument in writing or the facts of a transaction are of a character to leave in some doubt what the party thereto intended should be the precise nature of the legal effect thereof, the contract is not to be so construed as to render it invalid if it is reasonably susceptible of construction that will render it valid. If reasonably possible the contract will be so construed as to make it lawful. It will not be presumed that the parties intended to violate the law." 2 Elliott on Contracts, p. 796, § 1520.

So, also, the general rule is that:

"The law does not presume that parties to a contract intend by it to accomplish an illegal object, but it rather presumes that they intend to accomplish a legal purpose."

The complaint does not show upon its face that the transfer of the stock to the transferees was a sale within the meaning of the act.