2000 UT 71

**SURETY UNDERWRITERS, a Utah corporation, and Certified Surety Group, Ltd., a Delaware corporation, Plaintiffs and Appellants,**

v.

**E & C TRUCKING, INC., a Utah corporation, Demar Egbert, Steve Chiang, and Eva Yu Chiang, Defendants and Appellees.**

No. 990148.

Supreme Court of Utah.

Aug. 29, 2000.

David C. Anderson, Salt Lake City, for plaintiffs.

David M. McGrath, Salt Lake City, for defendants.

WILKINS, Justice:

¶ 1 Plaintiffs Surety Underwriters (Surety) and Certified Surety Group, Ltd. (Certified), appeal from the trial court's order granting summary judgment in favor of defendants Steve Chiang and Eva Yu Chiang and denying plaintiffs' motion for summary judgment. We affirm.

## BACKGROUND

¶ 2 E & C Trucking, Inc. (E & C), is a Utah corporation with three shareholders: Demar Egbert, Steve Chiang, and Eva Yu Chiang. Egbert is E & C's president.

¶ 3 Certified is a Delaware corporation.[1] Surety is a Utah corporation with its principal office in Salt Lake City. Pete Buffo is Certified's president, sole director, and secretary. Buffo is also Surety's president and director. At no time relevant to this dispute was Certified licensed in Utah, nor did Certified have a certificate of authority to transact an insurance business in Utah.

¶ 4 E & C used ComData Corporation, a Tennessee business, to pay its drivers. In 1995, a judgment was entered against E & C. To prevent default of its obligations to ComData for payroll reimbursement, E & C sought to obtain a bond in ComData's favor. Egbert contacted Buffo, a business acquaintance who maintained an office in Salt Lake City, regarding E & C's need of a bond. Buffo told Egbert that he was aware of a California company—referring to Certified—that could probably issue a bond. Egbert negotiated the bond with Buffo[2] and applied for the bond with Certified.

¶ 5 Certified approved a $50,000 bond on condition that E & C, Egbert, and the Chiangs sign a general indemnity agreement. The signed general indemnity agreement would enable Certified to recover money it paid ComData under the bond from those who signed the general indemnity agreement.

¶ 6 On May 18, 1995, Egbert, the Chiangs, and E & C, through Egbert, signed the general indemnity agreement in Salt Lake City.[3] Egbert then took the general indemnity agreement to Buffo's office in Salt Lake City, where he delivered it to Buffo. At that office, Egbert paid for and executed the payment bond. That same day, Egbert, acting on E & C's behalf, and Buffo, acting on Certified's behalf, signed the bond.[4]

¶ 7 At the time the bond and general indemnity agreement were executed, Certified was not licensed or otherwise authorized to conduct an insurance business in Utah. The Chiangs did not know Certified was not so licensed when they signed the general indemnity agreement.

¶ 8 E & C failed to honor its contractual agreement with ComData and defaulted under the bond. ComData then placed a claim under the bond with Certified. As a result, Certified performed under the bond and paid ComData $50,000, the amount of the bond.

---

1. The Chiangs assert that Certified's principal office is in Salt Lake City, while plaintiffs argue that during the time at issue, Certified did not even have an office in Utah.

2. The parties dispute whether the bond was negotiated in Utah.

3. Paragraph 31 of the general indemnity agreement provides, "This agreement shall be construed under the laws of the State of Utah and the parties agree to accept action of the courts therein."

4. Plaintiff Surety did not sign the bond or any of the documents at issue in this case. Rather, Surety was involved in the transaction because it performed accounting functions for Certified and was generally involved in the payment of claims. The parties dispute the extent of Surety's involvement in soliciting E & C's business and causing the agreement at issue to be reached and entered into.

¶ 9 In October 1995, plaintiffs Surety and Certified initiated this action against defendants E & C, Egbert, and the Chiangs. Plaintiffs sought $50,000, plus interest, and attorney fees, costs, and expenses. In November 1995, the Chiangs filed a motion to dismiss. The trial court denied the Chiangs' motion to dismiss in May 1996.

¶ 10 In June 1996, based on E & C and Egbert's failure to respond to plaintiffs' action, the trial court entered a default judgment for $50,000 against E & C and Egbert. In May 1998, plaintiffs filed a motion for summary judgment against the Chiangs.

¶ 11 The Chiangs filed their own motion for summary judgment in June 1998. In their memorandum supporting their motion and opposing plaintiffs' motion, the Chiangs argued that in issuing the bond and general indemnity agreement, Certified was conducting an insurance business in Utah. The Chiangs argued that because Certified was not properly licensed to carry on an insurance business in Utah nor was it a qualified foreign corporation, the Utah Insurance Act prohibited Certified from collecting on the general indemnity agreement.

¶ 12 In January 1999, following arguments on the cross-motions for summary judgment, the trial court granted the Chiangs' motion and denied plaintiffs' motion. The trial court found that plaintiffs "essentially admit" in their affidavits "that they engaged in certain conduct in the State of Utah, including entering into negotiations regarding said insurance contracts in the State of Utah, and execution of the same within this State." The court also found that plaintiffs' conduct in Utah constituted "engaging in the insurance business under Title 31 and 31(a) of the Utah Code." The court concluded that plaintiffs' conduct violated the Utah Code and that the contract of indemnity and suretyship between plaintiffs and the Chiangs is void and unenforceable. The trial court then entered an order dismissing, with prejudice, the case against the Chiangs. Plaintiffs appeal.

## STANDARD OF REVIEW

¶ 13 Plaintiffs appeal both of the trial court's summary judgment rulings. We first review the trial court's grant of the Chiangs' summary judgment motion. We then review the court's denial of plaintiffs' summary judgment motion.

¶ 14 We review the trial court's summary judgment rulings for correctness. *See Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.,* 970 P.2d 1273, 1277 (Utah 1998); *Certified Sur. Group, Ltd. v. UT Inc.,* 960 P.2d 904, 905–06 (Utah 1998). "We consider only whether the trial court correctly applied the law and correctly concluded that no disputed issues of material fact existed." *Aurora Credit Servs.,* 970 P.2d at 1277. This is the standard of review we apply because summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c).

¶ 15 In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to *the nonmoving party. See Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599; *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993); *see also Estate Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co.,* 844 P.2d 322, 324 n. 1 (Utah 1992) (clarifying that reviewing court should view facts in light most favorable to nonmoving party, not losing party). In this case, both parties moved for summary judgment. We therefore view the facts somewhat differently when reviewing the trial court's rulings on the separate summary judgment motions. When reviewing the trial court's order granting the Chiangs' summary judgment motion, we view the facts and reasonable factual inferences in the light most favorable to plaintiffs, the nonmoving party. However, when reviewing the trial court's order denying plaintiffs' summary judgment motion, we view the facts and reasonable inferences drawn therefrom in the light most favorable to the Chiangs, the nonmoving party.

## ANALYSIS

¶ 16 We first review plaintiffs' appeal of the trial court's order granting summary judgment to the Chiangs.

¶ 17 The trial court granted the Chiangs summary judgment because it concluded that in obtaining the contract of indemnity and suretyship, Certified had violated the Utah Code by engaging in the insurance business in Utah. Plaintiffs argue that the trial court's conclusion was erroneous because the transaction at issue here does not fall within the Utah Insurance Act's scope or purpose. In other words, plaintiffs argue that they did not engage in the insurance business in Utah. The Chiangs counter that the Utah Insurance Act does apply. The Chiangs assert that this suit is brought under the general indemnity agreement, which, the Chiangs argue, is a Utah insurance contract. That insurance contract was made in Utah and the Utah Insurance Act applies, the Chiangs argue, because the general indemnity agreement was signed by Utah residents in Utah, and the signing was the last act necessary to make the insurance contract binding.

■ ¶ 18 To review the trial court's grant of summary judgment to the Chiangs, we must determine whether plaintiffs violated the Utah Insurance Act in obtaining the contract of indemnity and suretyship. To make this determination, we first examine the Chiangs' argument that the general indemnity agreement is an insurance contract.

¶ 19 The Chiangs point to section 31A–1–301(75)(a) of the Utah Code to support their argument that the general indemnity agreement is an insurance contract. That section provides:

> (75) *Subject to Subsection (40)(b),* "surety insurance" includes:
>
> > (a) a guarantee against loss or damage resulting from failure of principals

to pay or perform their obligations to a creditor or other obligee.

Utah Code Ann. § 31A–1–301(75)(a) (Supp. 1995) (emphasis added).[5] The Chiangs argue that this section of the code describes the general indemnity agreement they signed and thus defines the agreement as insurance.

¶ 20 However, the Chiangs overlook subsection (40)(b), which provides:

> (40) "Insurance" means any arrangement, contract, or plan for the transfer of a risk or risks from one or more persons to one or more other persons, or any arrangement, contract, or plan for the distribution of a risk or risks among a group of persons that includes the person seeking to distribute his risk. "Insurance" includes:
>
> > . . .
>
> > (b) contracts of guaranty or suretyship *entered into by the guarantor or surety as a business and not as merely incidental to a business transaction.*

*Id.* § 31A–1–301(40)(b) (emphasis added). Thus, according to section 31A–1–301(40)(b), the general indemnity agreement is not an insurance contract if it was entered into incidental to a business transaction rather than as a part of the guarantor's or surety's business.

¶ 21 The general indemnity agreement was signed by E & C and its shareholders. Therefore, they, not plaintiffs, are the guarantors or surety under the general indemnity agreement. E & C's main business is trucking, not insurance. E & C and its shareholders signed the general indemnity agreement because Certified required that they sign it before Certified would issue the bond in favor of ComData. E & C sought the bond to

---

5. Throughout this opinion, we cite to the Utah Code as it existed at the time the parties signed the bond and general indemnity agreement on May 18, 1995. Many changes have been made to the Utah Insurance Act, Utah Code Ann. §§ 31A–1–101 to 31A–35–704 (1999 & Supp.1999), since May 1995. However, none of the changes made affect the substance of the law we review in this opinion. For example, although section 31A–1–301 no longer contains a definition of "surety insurance," *see* Utah Code Ann. § 31A–1–301 (Supp.1999), included in its definition of insurance is the following critical definition that we rely upon in our opinion today: "contracts of guaranty or suretyship entered into by the guar-

antor or surety as a business and not as merely incidental to a business transaction." Utah Code Ann. § 31A–1–301(48)(b)(ii) (Supp.1999); *cf. id.* § 31A–1–301(40)(b) (Supp.1995) (using exactly the same language for one of the definitions of insurance). Further, in our discussion in paragraphs 40 and 41 of how the parties' insurance agreement violated the Utah Code and how that violation affected their contract, the sections of the Utah Code we discuss remain unchanged. *Compare id.* § 31A–14–202 (1991) *with id.* § 31A–14–202 (1999); *compare id.* § 31A–15–102 (1991) *with id.* § 31A–15–102 (1999); *compare id.* § 31A–15–105 (1991) *with id.* § 31A–15–105 (1999).

ensure that ComData would continue to pay E & C's drivers. Under these facts, the guarantors' signing of the general indemnity agreement was incidental to the transaction of E & C's business. The guarantors did not enter into the agreement "as a business." *Id.* § 31A–1–301(40)(b). As a result, standing alone, the general indemnity agreement falls outside the Utah Insurance Act's definition of insurance.

■ ¶ 22 However, our determination of whether plaintiffs violated the Utah Insurance Act by entering into the transaction at issue here does not end with our conclusion that the general indemnity agreement, standing alone, is not an insurance contract. This is because the general indemnity agreement should not be considered separate from the parties' transaction when considering whether the parties' contract was an insurance contract. Instead, the general indemnity agreement should be seen as only *part* of the parties' contract; it is not the entire contract at issue in this case. The general indemnity agreement is simply part of the required consideration[6] that defendants gave to plaintiffs to obtain the desired bond. Defendants were told that plaintiffs would not issue the bond they sought unless defendants signed the general indemnity agreement. Defendants signed and delivered the general indemnity agreement to Certified, along with other monetary consideration, in order to be issued the needed bond. Under these facts, the general indemnity agreement, although a critical piece of the parties' contract, is not the entire contract at issue here and should not be viewed as such.

¶ 23 The parties' contract constituted the following arrangement: Certified would issue the $50,000 bond if E & C gave Certified consideration, including the executed general indemnity agreement. We next consider whether this contract was an insurance contract under the Utah Insurance Act.

¶ 24 As discussed earlier, "insurance" is defined under Utah Code Ann. § 31A–1–301(40)(b) as

any arrangement, contract, or plan for the transfer of a risk or risks from one or more persons to one or more other persons, or any arrangement, contract, or plan for the distribution of a risk or risks among a group of persons that includes the person seeking to distribute his risk. "Insurance" includes:

. . .

> (b) contracts of guaranty or surety-ship entered into by the guarantor or surety as a business and not as merely incidental to a business transaction.

Here, Certified is the guarantor or surety under the bond because, under the bond, Certified agrees to pay $50,000 to ComData in the event that E & C fails to pay ComData. Certified is in the business of issuing bonds. Certified's act of issuing the bond and collecting the required consideration, including the general indemnity agreement, was, for Certified, central to its business. It was not done "as merely incidental to a business transaction." *Id.* § 31A–1–301(40)(b). Further, the bond issued to E & C guarantees that Certified will pay ComData $50,000 if E & C fails to perform its obligation of paying ComData. Under these terms, the bond itself, standing alone, is surety insurance because it is "a guarantee against loss or damage resulting from failure of principals to pay or perform their obligations to a creditor or other obligee." *Id.* § 31A–1–301(75)(a). Therefore, because Certified agreed to issue the bond, which is surety insurance, as a part of its regular business, we conclude that the parties' contract is an insurance contract, as defined by the Utah Code.

¶ 25 We next examine whether, in creating and executing the parties' insurance contract, Certified engaged in the insurance business in Utah. To make this determination, we look at where the parties' insurance contract was made.

¶ 26 This court has long held that a contract between parties in different states is made where the last act necessary to make the contract valid and binding occurs. *See,*

---

**6.** Consideration is commonly defined as "[s]omething of value (such as an act, a forbearance, or a return promise) received by a promisor from a promisee." *Black's Law Dictionary* 300–01 (7th ed.1999).

*e.g.*, *SII MegaDiamond, Inc. v. American Superabrasives Corp.*, 969 P.2d 430, 434 (Utah 1998) (" 'In cases involving a contract which possesses possible elements in two or more jurisdictions ... the place where the last act is done which is necessary to complete the contract and give it validity is generally regarded as the place in which the contract is made.' " (quoting 16 Am.Jur.2d *Conflict of Laws* § 97 (1998) (footnotes omitted))); *Kansas City Wholesale Grocery Co. v. Weber Packing Corp.*, 93 Utah 414, 418, 73 P.2d 1272, 1274 (1937) ("A contract between parties in different states is made at the place where the last act necessary to give it validity is performed."); *Lawson v. Tripp*, 34 Utah 28, 36–37, 95 P. 520, 523 (1908) ("It is an elementary principle of the law of contracts that the place where the last act is done which is necessary to give validity to a contract is the place where the contract is made."); *see also Andrews v. Chase*, 89 Utah 51, 69, 49 P.2d 938, 947 (Utah 1935) (Hanson, J., dissenting) (explaining that because the last act necessary to complete the contract occurred in Utah, it was a Utah contract). We therefore must determine where the last act necessary to make the parties' insurance contract valid and binding occurred. We make this determination by closely examining affidavits submitted in support of the parties' memoranda supporting their motions for summary judgment and opposing their opponents' motions for summary judgment. Specifically, we examine Mr. Chiang's affidavit, Buffo's original affidavit, and Buffo's supplementary affidavit. We first examine Mr. Chiang's affidavit.

¶ 27 According to Mr. Chiang's uncontested sworn statement, Egbert negotiated the bond with Buffo, who maintained an office in Salt Lake City, Utah. Egbert gave the Chiangs the general indemnity agreement and told them they needed to sign it to obtain the bond. The Chiangs and Egbert then executed the general indemnity agreement in Salt Lake City on May 18, 1995. Mr. Chiang also stated in his affidavit, attached to his memorandum supporting his motion for summary judgment:

> To the best of my knowledge, information and belief, Egbert took the Indemnity Agreement to Buffo's Salt Lake City, Utah

office. Egbert then paid for and executed the Payment Bond (attached as Exhibit "A" to Plaintiffs' Motion), and then delivered the executed Indemnity Agreement and the executed Bond to Buffo in Buffo's office located in Salt Lake City[,] Utah on May 18 . . . .

The attached bond referred to in this sworn statement contains two signatures, Egbert's and Buffo's. The bond provides, just above the signatures, that it was signed and sealed on May 18, 1995.

¶ 28 We next examine Buffo's affidavits. The following statements, taken from Buffo's supplementary affidavit, contain the only information found in either of Buffo's affidavits regarding the execution of the insurance agreement:

> 6. The bond, which is the subject of this action, was through our office in Beverly Hills, California, was issued in the State of California, and forwarded for delivery to ComData in the State of Tennessee. The application for bond was submitted in California to Certified.

> 7. It is true that as a necessary condition for the issuance of the bond, the General Indemnity Agreement was required to be executed by the individual Defendants, which occurred in the State of Utah.

> 8. The signing of this indemnity contract was separate and apart from the solicitation, issuance, and delivery of the bond, all of which occurred outside of the State of Utah in compliance of the laws of the particular states involved.

> 9. To the best of my knowledge, the General Indemnity Agreement was delivered to the office of Surety Underwriters and Control, Inc., which conducts business and has an office in Salt Lake City, Utah. After it had been signed, Surety then notified Certified that it had received the General Indemnity Agreement and the bond was issued and ultimately delivered to ComData in Tennessee.

> 10. The original of the bond was sent from the California office to Mr. Egbert, who was required to sign the bond as President before it would be issued by the company in California by the signing of the

bond by a company representative, and the[n] forwarded to ComData Corporation in Tennessee.

This statement does not contradict Mr. Chiang's statement regarding where and when the bond and general indemnity agreement were signed. It specifically states where the bond was applied for, issued, and delivered; that defendants signed the general indemnity agreement in Utah; that the bond was solicited, issued, and delivered outside of Utah; that the bond was sent from California to Egbert, who signed it, as did Buffo, president of Certified; and that the bond was issued by Certified in California.

¶ 29 Chiang's and Buffo's affidavits therefore do not contradict each other regarding the sequence of events leading up to and including the execution of the parties' insurance agreement. According to the undisputed facts, Egbert negotiated the terms of the bond with Buffo, who had a Salt Lake City office with Surety. The bond application was then submitted to Certified in California. Certified sent the bond to Salt Lake City to be executed. The Chiangs, Egbert, and E & C, through Egbert, signed the general indemnity agreement on May 18, 1995, in Salt Lake City. Egbert then took the general indemnity agreement to Buffo's office in Salt Lake City, where Egbert delivered the general indemnity agreement. Surety then notified Certified that it had received the general indemnity agreement, and Egbert paid for and signed the bond in Buffo's Salt Lake City office on May 18. Buffo also signed the bond on May 18. The bond was then issued by Certified in California and forwarded and delivered to ComData in Tennessee.

¶ 30 In reviewing these undisputed facts, it becomes apparent that the last act necessary to make the parties' contract binding was the signing of the bond. Up to that point, the contract was being negotiated and consideration was being given for it. When the bond was signed, however, the parties' contract became binding. Where the bond was issued and delivered does not affect our analysis as these events occurred after the bond was signed and the parties' contract was already binding.

¶ 31 Although Buffo's affidavit addresses where the bond was applied for, issued, delivered, and signed by Egbert, it does not address where Buffo himself signed the bond. Chiang's affidavit, however, includes the following statement:

To the best of my knowledge, information and belief, Egbert took the Indemnity Agreement to Buffo's Salt Lake City, Utah office. Egbert then paid for and executed the Payment Bond (attached as Exhibit "A" to Plaintiffs' Motion), and then delivered the executed Indemnity Agreement and the executed Bond to Buffo in Buffo's office located in Salt Lake City[,] Utah on May 18 . . . .

The attached bond this sworn statement refers to contains Egbert's and Buffo's signatures and states that it was signed and sealed on May 18, 1995. Thus, Chiang's statement specifically states that Egbert signed the bond in Salt Lake City on May 18. It is clear from the date on the bond that Buffo also signed the bond on May 18.

¶ 32 The trial court made the following finding of fact regarding where Buffo signed the bond: "In their Affidavits, plaintiffs essentially admit that they engaged in certain conduct in the State of Utah, including entering into negotiations regarding said insurance contracts in the State of Utah, *and execution of the same within this State.*" (Emphasis added.) At first blush, this finding may seem to be inaccurate; however, after examining and analyzing the facts in the record, we see that this is actually an accurate and thoughtful finding of uncontested fact.

¶ 33 We know from the bond itself that Buffo signed it. We also know from the bond that Buffo and Egbert signed it on the same day, May 18, 1995, the day that the Chiangs, Egbert, and E & C executed and delivered the general indemnity agreement in Salt Lake City. We also have Mr. Chiang's sworn, uncontested statement that on May 18, Egbert delivered the executed general indemnity agreement to Buffo in Buffo's Salt Lake City office, where Egbert paid for and executed the bond. The reasonable implication raised by these facts is that Buffo also

signed the bond in his Salt Lake City office on May 18.

¶ 34 However, Buffo's signing the bond in Salt Lake City means that the last act necessary to make the parties' contract binding occurred in Utah, subjecting the contract to the Utah Insurance Act. Because subjecting the contract to the Utah Insurance Act leads to an unfavorable result for plaintiffs, and because that unfavorable result is arrived at by drawing an implication from the facts, we again examine the appropriate standard of review in this case, which is an appeal from a summary judgment.

¶ 35 On an appeal from a summary judgment ruling, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See Tretheway v. Miracle Mortgage, Inc.*, 2000 UT 12, ¶ 2, 995 P.2d 599. In this instance, the nonmoving parties are plaintiffs. The question before us, however, is whether the court may draw a reasonable inference from uncontested facts, even though adverse to the nonmoving parties. In other words, even though the facts support the reasonable inference that Buffo signed the bond in Utah on May 18, is such an inference prohibited simply because it is unfavorable to plaintiffs?

■ ¶ 36 We conclude that it is not. The law simply requires that the trial court view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. In this case, Buffo is the president of both Certified and Surety. He is the sole director of Certified and a director of Surety. He is also the secretary of Certified. Furthermore, Buffo is the person who signed the bond on behalf of Certified. He is also the person who submitted two affidavits—an initial affidavit and a supplementary affidavit—to support plaintiffs' summary judgment motion and to counter the Chiangs' summary judgment motion. Buffo's initial affidavit was filed with plaintiffs' summary judgment motion; however, his supplementary affidavit was filed after the Chiangs' summary judgment motion, which was accompanied by Mr. Chiang's affidavit. Mr. Chiang's affidavit raised the clear and reasonable implication that both Egbert and Buffo signed the bond on May 18 in Salt Lake City. Yet, in

neither of his affidavits did Buffo even address that implication. He made absolutely no effort to answer the question raised by Chiang's affidavit of where he signed the bond. Instead, it appears that Buffo carefully avoided answering the question in his supplementary affidavit. In that affidavit, Buffo addressed where the bond was solicited, issued, and delivered, but he skirted the issue of where the bond was signed.

■ ¶ 37 We conclude that in this situation, where Buffo, president and director of both plaintiff companies, and signer of the bond, made no attempt to advance any information on the key issue of where the bond was signed, but instead carefully and artfully avoided answering the question, the law allows the trial court to draw the reasonable inference from the facts that Buffo signed the bond on May 18 in Salt Lake City. To draw the only other possible inference—that Buffo signed the bond outside of Utah on May 18—would be *unreasonable* in light of the facts before the court, as would be ignoring the obvious and reasonable inference supported by the uncontested sworn facts. The law requires that, as much as is possible, the trial court view the facts and reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. It does not require unreasonable factual inferences, nor does it require that the court turn a blind eye to reasonable inferences based on uncontested facts.

¶ 38 Because we draw the reasonable inference that the bond was signed in Utah, and because that was the last act necessary to make the parties' insurance contract binding, we conclude the parties' insurance contract was made in Utah. As a result, it falls within the scope of the Utah Insurance Act.

■ ¶ 39 We next examine if the parties' Utah insurance contract violated the Utah Insurance Act and, if so, how that violation affects their contract.

¶ 40 It is undisputed that at the time the parties entered into the insurance contract, Certified was not licensed to engage in an insurance business in Utah, nor did it have a certificate of authority, *see* Utah Code Ann. § 31A–14–202 (1999). Thus, by entering into

this insurance contract in Utah when it was not so authorized, Certified violated the Utah Insurance Act. *See id.* § 31A–15–102.

¶ 41 Because Certified made this insurance contract in Utah when it was not authorized to so do, section 31A–15–105(1) of the Utah Code applies. That section provides as follows:

> (1) An insurance contract entered into in violation of this chapter is unenforceable by, but enforceable against, the insurer. In an action against the insurer on the contract, the insured is bound by the terms of the contract as affected by this title and rules adopted under this title.

Utah Code Ann. § 31A–15–105(1) (1999). Thus, under this statute, the parties' insurance contract is enforceable against the insurer, Certified, but Certified cannot enforce the insurance contract's terms against the insured. As a result, the general indemnity agreement, which constitutes a part of that insurance contract, cannot be enforced against the Chiangs. In other words, section 31A–15–105(1) bars plaintiffs from recovering from the Chiangs the $50,000 plaintiffs paid on the bond. Because plaintiffs cannot enforce the general indemnity agreement against the Chiangs, we hold that the trial court correctly granted the Chiangs' motion for summary judgment.

¶ 42 For the same reasons given above, we also hold that the trial court correctly denied plaintiffs' motion for summary judgment.

¶ 43 We reject the other arguments advanced on appeal, including the Chiangs' argument that they are entitled to costs and reasonable attorney fees for defending this allegedly frivolous appeal, because we conclude the appeal is not frivolous and was not made in bad faith.

## CONCLUSION

¶ 44 The trial court was correct in both granting the Chiangs' motion for summary judgment and denying plaintiffs' motion for summary judgment. Because plaintiffs violated the Utah Code by entering into the parties' insurance contract, plaintiffs may not enforce the general indemnity agreement against the Chiangs.

¶ 45 We affirm.

¶ 46 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice DURRANT concur in Justice WILKINS' opinion.