# IN THE UTAH COURT OF APPEALS

----ooOoo----

One Beacon American Insurance Co.; )           OPINION
Pennsylvania General Insurance )
Company; and Employers' Fire )     Case No. 20100327-CA
Insurance Company, )
                            )
     Plaintiffs and Appellants, )         F I L E D
                            )      (April 5, 2012 )
v. )
                            )
                            )     2012 UT App 100
Huntsman Polymers Corporation nka )
Huntsman Advanced Materials, LLC, )
                            )
     Defendant and Appellee. )

-----

Third District, Salt Lake Department, 090908662
The Honorable Glenn K. Iwasaki

Attorneys:     John R. Lund and Julianne P. Blanch, Salt Lake City, for Appellants
                Kamie F. Brown and Frederick R. Thaler, Salt Lake City, for Appellee

-----

Before Judges Voros, Thorne, and Roth.

ROTH, Judge:

¶1     Plaintiff One Beacon American Insurance Co. (One Beacon) appeals the district court's denial of its motion for summary judgment and grant of summary judgment to Defendant Huntsman Polymers Corporation (Huntsman). We affirm.

BACKGROUND

¶2     This case involves a dispute between One Beacon and Huntsman over the amount One Beacon, the insurer, is required to indemnify Huntsman, the insured, for defense against and settlement of a wrongful death lawsuit.  In particular, the parties contest when liability coverage is triggered under a commercial general liability (CGL) insurance policy for bodily injury in the form of an asbestos-related progressive disease.  The issue before us is whether Utah law or Texas law should be applied to interpret the CGL insurance policy and resolve this contractual dispute.

I.  The Wrongful Death Lawsuit

¶3     The wrongful death lawsuit that underlies this dispute arose from the death of Edward Whetsell.  From 1963 to 1975, Whetsell was employed at a petrochemical plant in Texas that produced products allegedly containing asbestos.  This facility was then owned and operated by El Paso Products Company, a Texas corporation.  While employed at the Texas facility, Whetsell allegedly inhaled asbestos fibers.

¶4     Whetsell was diagnosed with mesothelioma in 2004.  He eventually died from the illness, and his family filed a wrongful death lawsuit in Texas against Huntsman, a Delaware corporation with its principal place of business in Utah, which had purchased El Paso Products in 1997.  In 2007, Huntsman and Whetsell's family settled the wrongful death lawsuit.

II.  The Insurance Claim and the Action for Declaratory Judgment

¶5     Following the settlement, Huntsman sought indemnification under a CGL insurance policy that its predecessor, El Paso Products, had entered into with One Beacon.[1]  From 1963 through 1977--almost the exact time period that Whetsell was employed at the Texas facility--One Beacon, a Massachusetts corporation, insured El Paso Products.  During this time period, One Beacon annually issued a CGL insurance policy to El Paso Products with each policy covering a period of one year.  Under the policy, One Beacon agreed to "pay on behalf of [El Paso Products] all sums which [El Paso Products] . . . become[s] legally obligated to pay as damages because of . . . bodily

---

1.  To be precise, El Paso Products contracted for insurance coverage with Commercial Union Insurance Company, which is One Beacon's predecessor.

injury . . . caused by an occurrence." The policy defined "bodily injury" as "bodily injury, sickness or disease sustained by any person" and defined an "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury." The policy also provided that "all bodily injury . . . arising out of continuous or repeated exposure to substantially the same general condition[ is] considered as arising out of one occurrence."[2] The CGL insurance policy covered the Texas facility where Whetsell worked, as well as additional facilities located in other states.[3] The policy did not include a choice of law provision.

¶6     El Paso Products was subsequently insured by another company from 1977 to 1993. However, beginning in 1986, that insurer excluded from coverage asbestos-related bodily injury. As a result, El Paso Products, and accordingly, Huntsman, have had no insurance coverage for bodily injury caused by asbestos since 1986.

¶7     As a successor in interest to El Paso Products, Huntsman submitted an insurance claim to One Beacon, requesting that One Beacon fully indemnify it for the defense and settlement costs of the wrongful death lawsuit. One Beacon paid only about 61% of the total amount of the defense and settlement costs. Huntsman requested that One Beacon pay the remainder, but One Beacon refused. One Beacon later recalculated and decided that it should only have paid Hunstman about 34% of the total defense and settlement costs. One Beacon then requested that Huntsman reimburse the difference between the 61% that One Beacon had already paid and the 34% it believed it was obligated to pay. Huntsman refused and reiterated its demand for full reimbursement.

¶8     In 2009, One Beacon brought this action, seeking a declaratory judgment that it had overpaid Huntsman and was entitled to recoup the overpayment or, alternatively,

---

2. As we will explain, *see infra* ¶ 10, the nature of the injury at issue here is "considered as arising out of one occurrence" due to "continuous or repeated exposure to substantially the same general condition[]." Thus, because the covered bodily injury here constitutes a single occurrence, for ease of explanation we will refer to the injury as being covered by a single policy.

3. In addition to insuring the Texas facility, the policy included several endorsements adding coverage for facilities located in New Mexico, Ohio, Wyoming, North Dakota, Idaho, Tennessee, Oklahoma, and Utah, providing coverage for the "portion of the risk located in said state."

that it had paid in full the entire amount it owed to Huntsman. Huntsman filed a counterclaim against One Beacon, alleging that One Beacon had underpaid what it owed to Huntsman and seeking full reimbursement for the defense and settlement costs.

¶9     In asserting their respective claims, the parties dispute the amount One Beacon owes Huntsman under the CGL insurance policy for the settlement and defense of the wrongful death lawsuit. At a more basic level, however, the parties' dispute raises the question of when a progressive or cumulative disease, such as the development of mesothelioma due to the inhalation of asbestos fibers, becomes a bodily injury that triggers coverage under a CGL insurance policy. This issue has been the subject of much litigation, and to understand the parties' respective arguments and aid in the following legal analysis, it is helpful to review the legal background of this issue as explained in other jurisdictions.

## III. Legal Background

¶10     "[T]here is universal agreement that excessive inhalation of asbestos can and does result in disease." *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1214 (6th Cir. 1980). When "asbestos particles become airborne" they can be "inhaled by persons in the area" and "deposited in the lungs." *Id.* If "enough asbestos particles are inhaled, they can cause a variety of pulmonary diseases." *Id.* Diseases that develop due to inhalation of asbestos fibers--such as mesothelioma, lung cancer, and asbestosis--are considered progressive diseases because "[i]t ordinarily takes years of breathing asbestos fibers for [the resulting disease] to occur." *Id.* at 1214 & n.1. These asbestos-related illnesses are "slowly progressive, insidious disease[s]," where "[a]s more and more asbestos particles settle in the lungs over years of exposure, the disease worsens" until it "clearly manifests itself." *Id*. at 1216. Although the development and progression of the disease is variable, generally "[t]he more asbestos fibers . . . inhale[d], the more quickly" the disease will manifest. *Id.* at 1214; *see also Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1038 n.3 (D.C. Cir. 1981) (explaining briefly the development of asbestosis, mesothelioma, and lung cancer, which are caused by "prolonged inhalation of asbestos fibers," and acknowledging that "[t]he seriousness of the disease . . . depends on the duration and intensity of inhalation and on individual idiosyncrasy").

¶11     The coverage provided for such progressive diseases is determined by interpreting the applicable insurance policy. "'An insurance policy,'" such as the one at

issue here, "'is merely a contract between the insured and the insurer.'" *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 8, 266 P.3d 733 (quoting *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 14, 140 P.3d 1210). As a result, insurance policies are interpreted as contracts: "[i]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Benjamin*, 2006 UT 37, ¶ 14 (internal quotation marks omitted); *see also Guaranty Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir. 2000) ("Generally, insurance policies are subject to the same rules of interpretation as other contracts."), *overruled by OneBeacon Ins. Co. v. Don's Bldg. Supply, Inc.*, 553 F.3d 901 (5th Cir. 2008).[4] CGL insurance policies,[5] such as the one at issue here, typically cover "bodily injury . . . caused by an occurrence," defining "bodily injury" as "bodily injury, sickness or disease sustained by any person," and "an occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury." This uniform policy language has been the subject of much interpretation in the context of progressive diseases--particularly those that result from inhalation of asbestos fibers. *See, e.g., Keene*, 667 F.2d at 1038-39 (interpreting multiple CGL insurance policies in a progressive disease case, which policies were "identical in all relevant respects" and provided "typical" coverage); *Forty-Eight Insulations*, 633 F.2d at 1215-16 (interpreting several CGL insurance policies in a progressive disease case,

---

4. In *OneBeacon Insurance Co. v. Don's Building Supply, Inc.*, 553 F.3d 901 (5th Cir. 2008), the Fifth Circuit explained that it "overrule[d] . . . the relevant portion of *Azrock*" based on a certified question sent to the Texas Supreme Court, which was decided in *Don's Building Supply, Inc. v. OneBeacon Insurance Co.*, 267 S.W.3d 20 (Tex. 2008). *See OneBeacon*, 553 F.3d at 902-03 (citing *Guaranty Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir. 2000)). As we will discuss when the *Azrock* decision becomes relevant to our analysis, *see infra* ¶¶ 48-50, the Texas Supreme Court in *Don's Building Supply* made no decision concerning the portion of *Azrock* that is relevant to this case. Rather, the *Don's Building Supply* decision seems to leave the *Azrock* decision untouched based on a distinction between insurance coverage for property damage and bodily injury. *See Don's Bldg. Supply,* 267 S.W.3d at 26 n.23, 28 & nn.29, 32. (Tex. 2008). *See also infra* ¶¶ 12, 51.

5. To be precise, some of the authority cited herein involves interpretation of comprehensive general liability insurance policies, while this case involves a commercial general liability insurance policy. For the purposes of this decision, the distinction is unimportant, and the relevant policy language is substantially the same.

explaining that "each of the policies uniformly defined" coverage because "the insurance industry uses standardized language in its general liability policies").

¶12    The policy language at issue here has generally been interpreted as "clearly provid[ing] that an 'injury,' and not the 'occurrence' that causes the injury, must fall within a policy period for it to be covered by the [insurance] policy." *Keene*, 667 F.2d at 1040. Typically, the distinction between the injury and the occurrence that causes the injury is not significant because the two usually "transpire[] simultaneously[] or . . . in close temporal proximity to one another." *Id.* In progressive disease cases, however, particularly those "involving asbestos-related disease, . . . inhalation [of asbestos]--the 'occurrence' that causes the injury--takes place substantially before the manifestation of the ultimate [disease]--asbestosis, mesothelioma, or lung cancer." *Id.* Thus, "cumulative, progressive disease[s such as these] do[] not fit the disease or accident situation which [CGL insurance] policies typically cover" because although "[t]here is usually little dispute as to when an injury occurs when dealing with a common disease or accident[,] . . . there is considerable dispute as to when an injury from asbestos[] should be deemed to [have] occur[red]." *Forty-Eight Insulations*, 633 F.2d at 1222. It is, therefore, commonly accepted that "[c]umulative disease cases are different from the ordinary accident or disease situation" and are "entirely different" from property damage cases. *Id.* at 1214, 1216, 1218-19 (rejecting the argument that progressive diseases be treated the same as any other disease); *see also Azrock*, 211 F.3d at 247 (stating that the distinction of cumulative diseases from other bodily injury and property damage cases "is relevant" because "[c]umulative disease cases are different from the ordinary accident or disease situation," and rejecting interpretations of similar policy language "in entirely different contexts, particularly property damage cases"). Because "[a]sbestos-related diseases . . . differ from most injuries[, they] . . . present a difficult problem of contractual interpretation." *Keene*, 667 F.2d at 1040.

¶13    The difficulty in determining when coverage of a progressive disease is triggered under a CGL insurance policy commonly arises in attempting to interpret the term "bodily injury." *See generally id.* at 1042, 1043-44 (interpreting a CGL insurance policy to determine when an injury occurs in the context of a progressive disease so as to trigger coverage); *Forty-Eight Insulations*, 633 F.2d at 1215-20, 1222-23 (same). In the context of progressive diseases, courts have recognized that the term "bodily injury" is susceptible to several interpretations. First, bodily injury can be interpreted as occurring "whenever asbestos fibers [ar]e inhaled," causing "tiny, scar-like" tissue damage in the lungs. *Forty-Eight Insulations*, 633 F.2d at 1217-18. Under this interpretation, bodily injury is not the eventual disease but is, rather, the tissue "damage . . . [that begins]

shortly after the initial inhalation of asbestos fibers" and "worsens as the victim breathes in more and more asbestos fibers." *Id.* at 1217-18, 1222. Second, "bodily injury" can also be interpreted to occur when the disease actually "manifests itself" and "bec[o]me[s] apparent." *Id.* at 1216-17. In other words, the "'bodily injury' does not occur until [the] cellular damage advances to the point of becoming a recognizable disease." *Keene*, 667 F.2d at 1043. Under this interpretation, the disease can be considered to have manifested itself at the stage where "the body's defenses [are] overwhelmed" or when the disease is diagnosed. *Forty-Eight Insulations*, 633 F.2d at 1217-18. Third, "bodily injury" can be interpreted to be the intermediate development of the condition between the inhalation of asbestos fibers and the actual manifestation of the disease--commonly referred to as "exposure in residence." *Keene,* 667 F.2d at 1045; *see also Azrock*, 211 F.3d at 245. Thus, because the policy language--particularly the term "bodily injury"--is clearly susceptible to more than one reasonable interpretation, CGL insurance policies have commonly been found to be ambiguous as applied to progressive diseases. *See Keene*, 667 F.2d at 1041, 1043 (explaining that "the terms of the policies [at issue do not] lead [the court] directly to a resolution of the coverage issues raised" and the "policy language does not direct [the court] unambiguously to" either of the two interpretations proposed by the parties); *Forty-Eight Insulations*, 633 F.2d at 1222 (reasoning that "the contractual terms in issue . . . are inherently ambiguous as applied to the progressive disease context"); *Azrock*, 211 F.3d at 243-44 (explaining that CGL insurance policies "are susceptible of more than one reasonable interpretation in the progressive disease context, and are therefore ambiguous as a matter of law" because "federal and state courts have developed [multiple] interpretations of precisely the same uniform [CGL] policy language in the context of continuous exposure, latent disease cases").

¶14    Based on these varying interpretations of the term "bodily injury," several theories have emerged on how to determine the type of bodily injury that triggers coverage of progressive diseases under CGL insurance policies. The three most prominent theories are the manifestation trigger theory, the exposure trigger theory, and the continuous trigger theory.[6] The manifestation trigger theory is not directly relevant to this case but is nonetheless helpful in understanding the continuous trigger theory, which is an amalgam of the manifestation and exposure trigger theories. Under the manifestation trigger theory, the term "bodily injury" is interpreted to mean when the disease actually "manifests itself," *see Forty-Eight Insulations*, 633 F.2d at 1216, and

---

6. There are multiple variations of these core trigger theories that we need not address.

"becom[es] a recognizable disease," *see Keene*, 667 F.2d at 1043. Thus, under this theory, the coverage provided by a CGL insurance policy is triggered "when the condition 'manifests'" or when the disease "becomes clinically evident, identifiable, or diagnosable," *Azrock*, 211 F.3d at 245 (citing *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 19-20, 23 (1st Cir. 1982) (adopting the manifestation trigger theory to determine when coverage is triggered under a CGL insurance policy in a progressive disease case)). "The date of 'manifestation' is usually equated with the date of diagnosis . . . or the date a claimant experiences symptoms that impair his sense of well-being." *Id.; see also Keene*, 667 F.2d at 1042-43, 1045-46 (explaining the manifestation trigger theory and declining "to hold that only the manifestation of disease can trigger coverage[ because then] the insurance companies would have to bear only a fraction of . . . total liability for asbestos-related diseases"); *Forty-Eight Insulations*, 633 F.2d at 1216-17, 1219-20 (explaining the manifestation trigger theory and rejecting it because "[n]o doctor would say that [a disease] occurred when it was discovered").

¶15    In contrast, under the exposure trigger theory, the term "bodily injury" is interpreted to be "the subclinical tissue damage that occurs on inhalation of . . . asbestos [fibers]," which is assumed to occur during the injured person's "period of employment in an asbestos-laden environment." *Azrock*, 211 F.3d at 245. Thus, under this theory, the coverage provided by a CGL insurance policy is triggered only during policy periods in which the exposure to asbestos occurred. *See id.; see also Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1216-23 (6th Cir. 1980) (adopting the exposure trigger theory).

¶16    Finally, the continuous trigger theory is a composite of the manifestation theory and the exposure theory, and it construes the term "bodily injury" to encompass the subclinical tissue damage caused by inhalation of asbestos fibers, *see Forty-Eight Insulations*, 633 F.2d at 1217-18, the intermediate "exposure in residence," *see Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1045 (D.C. Cir. 1981), and the eventual manifestation of the actual disease, *see id.* at 1042-43; *Forty-Eight Insulations*, 633 F.2d at 1216-17, 1222. Thus, coverage is triggered continuously throughout the entire progression of the disease, from exposure through manifestation. *See Keene*, 667 F.2d at 1044-47 (adopting what has become known as the continuous trigger theory); *Guaranty Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir. 2000), *overruled by OneBeacon Ins. Co. v. Don's Bldg. Supply, Inc.*, 553 F.3d 901 (5th Cir. 2008).

¶17    Unfortunately, the extensive litigation to determine when insurance coverage is triggered under CGL insurance policies in the context of progressive diseases "has

resulted in irreconcilable holdings" arising from interpretations occurring "under different sets of facts, [and] against the backdrop of the contra proferentem doctrine," which requires that if an insurance "policy is [ambiguous and] susceptible of more than one reasonable interpretation, the court must resolve the uncertainty by adopting the construction that most favors the insured." *Azrock*, 211 F.3d at 243-44.

¶18 Having addressed the relevant legal background, we now turn to the parties' arguments that are premised on these legal principles.

IV. The Parties' Cross-Motions for Summary Judgment

¶19 In October 2009, One Beacon and Huntsman filed cross-motions for summary judgment. Because the insurance contract did not include a choice of law provision, the parties each proposed application of the law of a different state to determine the trigger theory that would be applied to interpret the CGL insurance policy.

¶20 In support of its motion for summary judgment, One Beacon argued that Utah law should be controlling, which One Beacon asserts requires application of the continuous trigger theory. (Citing *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127 (Utah 1997).)[7] If the continuous trigger theory were applied here, coverage under the CGL insurance policy would be triggered for the entire forty-one-year time period from Whetsell's alleged inhalation of asbestos fibers while employed at the Texas

---

7. Although One Beacon presents *Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997), as "neatly deal[ing] with the issue[]" of "what coverage trigger is used in a continuous injury case," it eventually clarifies that "choice of a trigger theory was not an issue on appeal" in *Sharon Steel* because "one of the insurers in that case[] settled the [coverage] issue with the insured using a continuous trigger analysis," which the appellant did not contest. *See id.* at 130-31. Thus, although *Sharon Steel* may be instructive on how to allocate defense and indemnity costs among multiple insurers, it is not helpful in determining whether Utah law favors application of the continuous trigger theory or the exposure trigger theory. *See id.*; *see also Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 2012 UT 1, ¶¶ 1-2, 22 (explaining how to apportion defense costs between multiple insurers based on the method of calculation announced in *Sharon Steel*, yet not deciding how coverage is triggered for progressive bodily injury). It is further notable that *Sharon Steel* involved property damage rather than bodily injury in the form of a progressive disease. *See Sharon Steel*, 931 P.2d at 130-31; *see also supra* ¶ 12.

facility beginning in 1963 until his diagnosis with mesothelioma in 2004. One Beacon, however, only insured El Paso Products for a period of fourteen years, from 1963 through 1977, and therefore would only be required to indemnify Huntsman for damages and costs proportionate to its time on the risk. Depending on whether the eighteen years from 1986 to 2004 when El Paso Products and Huntsman were not insured for asbestos-related bodily injury are included in or excluded from the calculation, One Beacon would be obligated to indemnify Huntsman for either approximately 34% or 61% of the defense costs and settlement of the wrongful death lawsuit.[8] Application of the continuous trigger theory therefore supported One Beacon's request for declaratory judgment that it had overpaid Huntsman and was entitled to reimbursement or, in the alternative, that it had paid Huntsman in full.

¶21　In contrast, Huntsman's cross-motion for summary judgment urged application of Texas law, which it argued requires application of the exposure trigger theory. (Citing *Azrock*, 211 F.3d at 242-44.) If the exposure trigger theory were applied, only the years that Whetsell inhaled asbestos fibers while employed at the Texas facility from 1963 to 1975 would trigger coverage. Because One Beacon was the only insurance provider for El Paso Products during Whetsell's period of employment, One Beacon would be obligated to indemnify Huntsman for 100% of the defense and settlement costs of the wrongful death lawsuit. Application of the exposure trigger theory

---

8. In its original response to Huntsman's insurance claim, One Beacon excluded the eighteen years from 1986 to 2004 that El Paso Products and Huntsman were not insured and based its calculation on only the twenty-three years El Paso Products was insured from 1963 to 1986. As a result, One Beacon initially concluded that it was obligated to indemnify Huntsman for approximately 61% of the defense and settlement costs of the wrongful death lawsuit. However, One Beacon later determined that it was only obligated to indemnify Huntsman for about 34% of the defense and settlement costs of the wrongful death lawsuit. It arrived at this lower figure by including the eighteen years that El Paso Products was not insured, therefore basing its calculation on the entire forty-one-year time period from 1963 to 2004. Under this approach, One Beacon treats El Paso Products and Huntsman as self-insured for the eighteen years that the companies were not insured for asbestos-related bodily injury. In addition, under either approach, the other insurance company that provided coverage to El Paso Products for asbestos-related bodily injury from 1977 to 1986 would be responsible for its respective time on the risk.

therefore supported Huntsman's cross-claim that it was entitled to indemnification in full for the defense and settlement costs of the wrongful death lawsuit.[9]

¶22    In order to resolve the parties' competing motions for summary judgment, the district court had to decide whether Texas law or Utah law controls the parties' contractual dispute.  To determine which state's law is controlling, the district court applied section 188 of the Restatement (Second) of Conflict of Laws, which has been adopted under Utah law and is referred to as the most significant relationship analysis.  *See generally American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996) (holding "that the most significant relationship test . . . is the appropriate rule for Utah courts to apply to a conflict of laws question in a contract dispute" (citing Restatement (Second) of Conflict of Laws § 188 (1971))).  The district court concluded that "Texas has the most significant relationship" to the insurance contract and, therefore, "Texas law should apply."  The court further concluded that under Texas law, the exposure trigger theory applied, reasoning that "no Texas court has specifically adopted the continuous trigger theory . . . and only the exposure theory has been adopted with respect to . . . bodily injury claims."  The court therefore denied One Beacon's motion for summary judgment and granted Huntsman's cross-motion for summary judgment, awarding Huntsman the unpaid balance between what it had expended in defense and settlement costs of the wrongful death lawsuit and what One Beacon had previously paid.  One Beacon appeals.

---

9.  It is interesting that in this case the insured, Huntsman, seeks application of a trigger theory that generally minimizes the period of potential coverage, while the insurer, One Beacon, proposes application of a trigger theory that generally maximizes the period of potential coverage.  Indeed, the continuous trigger theory advocated here by One Beacon is typically viewed as favoring the insured because it most broadly defines the concept of injury under the terms of an insurance policy and maximizes the period of coverage.  *See Azrock*, 211 F.3d at 248 ("The obvious advantage of the [continuous trigger] theory to an insured is that it maximizes coverages and requires little or no individual proof of injury.").  In this case, however, application of the continuous trigger theory is disadvantageous to the insured because of the extensive time period during which El Paso Products and Huntsman had no insurance coverage for asbestos-related bodily injury.  Nevertheless, this unusual alignment of legal theory and self-interest is little more than an idiosyncracy that, in the end, does not impact our analysis.

ISSUES AND STANDARDS OF REVIEW

¶23    One Beacon challenges the district court's denial of its motion for summary judgment and the grant of summary judgment to Huntsman. Whether the district court appropriately granted or denied summary judgment is a question of law, reviewed for correctness. *See American Nat'l*, 927 P.2d at 188.

¶24    One Beacon challenges the district court's basis for its grant of summary judgment, namely, its determination that under the most significant relationship analysis, articulated in section 188 of the Restatement (Second) of Conflict of Laws, Texas law controls this contractual dispute. Proper application of the most significant relationship analysis is a question of law, which we review for correctness. *See id.* (explaining that in conducting its choice of law analysis, the court "examine[d] only issues of law," which are reviewed for correctness). One Beacon also challenges the district court's conclusion that Texas law requires application of the exposure trigger theory to bodily injury claims. "[W]hen reviewing an application or interpretation of law we use a correction of error standard," giving no deference to the lower court's decision. *See Avis v. Board of Review of Indus. Comm'n*, 837 P.2d 584, 586 (Utah Ct. App. 1992) (alteration in original) (internal quotation marks omitted).


ANALYSIS

I.  Summary Judgment

¶25    "[S]ummary judgment is proper when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law." *American Nat'l*, 927 P.2d at 188 (citing Utah R. Civ. P. 56(c)). "Since the facts are [generally] undisputed here, we examine only [the legal] issues" raised by One Beacon. *See id.*

¶26    One Beacon argues that the district court erred in denying its motion for summary judgment and granting summary judgment to Huntsman. Specifically, One Beacon asserts that the district court erroneously determined that Texas law governs this dispute, arguing that Utah is the state with the most significant relationship to this dispute. One Beacon further argues that Utah law requires application of the continuous trigger theory rather than the exposure trigger theory that the district court applied. In the alternative, One Beacon argues that even if the district court correctly determined that Texas has the most significant relationship to this dispute, the exposure

trigger theory would not be applied under Texas law. We conclude that the district court correctly determined that Texas has the most significant relationship to this dispute, and we therefore do not address which trigger theory would be applied under Utah law. We further conclude that the district court correctly determined that Texas law requires application of the exposure trigger theory in this case.

A. Choice of Law[10]

¶27    The parties agree that this case involves a contractual dispute requiring interpretation of an insurance contract. *See generally Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 15, 54 P.3d 1054 (explaining that at the outset of a conflicts of law analysis, the court must "characterize the nature of the claim" to determine whether the issue presented is based in tort, contract, property, or another area of law, and identifying this determination as "essential" because the analysis varies according to the type of action brought). Because the insurance contract at issue does not include a choice of law provision, this court must determine whether Texas or Utah law applies.

---

10. Typically, a choice of law analysis is preceded by a determination of whether there is a true conflict between the laws of those states that are interested in the dispute. *See, e.g., American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) (acknowledging that a choice of law problem only arises if there is a conflict between the laws of the competing states with a substantial relationship to the underlying issue (citing Restatement (Second) of Conflict of Laws § 205 cmt. a (1971))). Although the parties' summary judgment and appellate arguments are inherently premised on the position that there is a conflict between Utah and Texas law, the parties also present alternative arguments asserting differing interpretations of Utah and Texas law that are more favorable to their respective positions. Whether there is a true conflict between Texas and Utah law is not an issue that is easily answered because neither Texas law nor Utah law is settled on this particular legal issue. It is notable, however, that there is more Texas authority on the subject. *Compare supra* ¶ 20 n.7, *with infra* ¶¶ 48-50; *see also* Restatement (Second) of Conflict of Laws § 6(2)(g) (1971) (specifying as a "factor[] relevant to the choice of the applicable rule of law" the "ease in the determination and application of the law to be applied"). We will therefore undertake our analysis presuming that a conflict exists because the parties' arguments are based on the existence of a conflict. Further, because we ultimately conclude that Texas has the most significant relationship to this dispute, *see infra* ¶¶ 45-46, we presume a conflict exists so as to avoid unnecessary interpretation of Utah law.

*See generally* Restatement (Second) of Conflict of Laws § 188(2) (1971) (providing that a choice of law analysis is required "[i]n the absence of an effective choice of law by [contracting] parties"). One Beacon and Huntsman further agree that the law of the forum state--in this case, Utah--governs a choice of law analysis. *See American Nat'l Fire Ins. Co.*, 927 P.2d 186, 188-90 (Utah 1996). Thus, we apply the most significant relationship analysis, as adopted under Utah law. *See id.* at 190.

¶28 Section 188 of the Restatement (Second) of Conflict of Laws generally controls the most significant relationship analysis as applied to contractual disputes, providing that "[i]n the absence of an effective choice of law by [contracting] parties," the "rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188(1)-(2). To determine which state has the most significant relationship to the transaction and the parties in a contractual dispute, section 188 requires consideration of several contacts a contract may have to the states involved in the matter:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the . . . place of incorporation and place of business of the
> parties.

*Id.* § 188(2).

¶29 One Beacon argues that Utah has the most significant relationship to this dispute because the insurance contract's place of performance and the parties' principal place of business favor application of Utah law. According to One Beacon, because Utah is Huntsman's principal place of business, One Beacon performed its obligation under the CGL insurance policy in Utah by paying the insurance claim to Huntsman in Utah. Huntsman responds that the place of performance and principal place of business favor application of Texas law, arguing that, although actual performance occurred in Utah when One Beacon paid the insurance claim to Huntsman, the intended place of performance at the time of contracting was Texas because the original contracting parties would have expected that any insurance claims would have been paid to El Paso Products, a Texas corporation, in Texas. Huntsman further argues that the location of the subject matter of the contract--or the location of the insured risk--favors application of Texas law because the bodily injury covered by the CGL insurance policy occurred at

a facility located in Texas. According to Huntsman, Texas therefore has the most significant relationship to this dispute.

¶30    Ultimately, we agree with Huntsman that Texas has the most significant relationship to this dispute as the intended place of performance at the time of contracting and as the location of the insured risk. We begin our analysis by briefly addressing the contacts we consider to be inconclusive--namely, the place of negotiation and the place of contracting. We then consider the parties' arguments concerning the place of performance and the principal place of business. We finally address the location of the subject matter of the contract, also described as the location of the insured risk.

### 1. Place of Negotiation and Place of Contracting

¶31    With regard to the place of negotiation, the district court reasoned that "there is little to no evidence about how the contract was negotiated, who negotiated the contract, or where it was signed." One Beacon agrees, explaining that "[t]he [p]lace of [n]egotiation is [i]ndeterminate" because "[t]here is no evidence in the record regarding where [the parties] may have met or corresponded," nor is there "evidence that [the parties] met anywhere to bargain over particular terms of the insurance policies and reach agreement." Huntsman also generally concedes that "there is no direct evidence of where One[ ]Beacon and El Paso [Products] discussed the terms of the [insurance] policies." We agree with the parties that this contact is inconclusive and do not consider it further.

¶32    As to the place of contracting, "a contract between parties in different states is made where the last act necessary to make the contract valid and binding occurs." *Surety Underwriters v. E&C Trucking, Inc.*, 2000 UT 71, ¶ 26, 10 P.3d 338; *see also* Restatement (Second) of Conflict of Laws § 188 cmt. e (1971) ("[T]he place of contracting is the place where occurred the last act necessary under the forum's rules of offer and acceptance, to give the contract binding effect."). Both parties agree with this general proposition but disagree on what action constitutes the last act necessary to make effective a contract for insurance coverage. As a result of their differing arguments, the parties dispute whether the place of contracting is Texas or Massachusetts; they agree, however, that it was not Utah. Because neither party ultimately argues that Massachusetts has the most significant relationship to this dispute, further efforts to determine the precise place where this insurance contract became effective are, in the end, unlikely to advance our analysis. Given the relevant contacts that remain to be

considered and the relative unimportance of this contact to the most significant relationship analysis in general, *see* Restatement (Second) of Conflict of Laws § 188 cmt. e ("Standing alone, the place of contracting is a relatively insignificant contact."), we simply conclude, as the parties concede, that the place of contracting was not Utah and attribute no importance to the possibility that the place of contracting may have been Texas.

### 2. Place of Performance and Principal Place of Business

¶33　We next consider together the place of performance and the parties' place of incorporation or principal place of business. The place of performance under an insurance contract tends to be the "place of the insurer's payment of claims [to the insured] under the policy," and typically the insurer makes payment of claims in the state where the insured is located. *Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.*, 580 F. Supp. 2d 678, 688 (N.D. Ill. 2008) (internal quotation marks omitted) (citing 2 Couch on Insurance 2d § 16:11, at 497 (rev. 1984)). One Beacon argues that "it partially performed its contractual obligations" under the insurance contract by "issuing the check for . . . the defense and indemnity costs . . . to Huntsman in Utah."[11] Stated differently, One Beacon argues that because Huntsman's principal place of business is in Utah and because the payment of a claim under the insurance contract was made to Huntsman in Utah, performance therefore occurred in Utah. Thus, according to One Beacon, these contacts favor application of Utah law. One Beacon further asserts the importance of these linked contacts because "[t]he fact that one of the parties . . . does business in a particular state assumes greater importance when combined with other contacts, such as . . . the place . . . of performance." Restatement (Second) of Conflict of Laws § 188 cmt. e (1971) (explaining further that the "significance [of the parties' place of incorporation and principal place of business] depends largely upon the issue involved and upon the extent to which they are grouped with other contacts, . . . assum[ing] greater importance when combined with other contacts"). One Beacon thus

---

11. One Beacon acknowledges that the parties dispute whether it fully performed under the insurance contract. One Beacon asserts, however, that it is uncontested that it partially performed by paying a portion of the insurance claim to Huntsman. One Beacon therefore construes the place of performance based on its performance thus far under the insurance contract, whether that performance is ultimately deemed to be partial or in full.

argues that because these combined contacts favor application of Utah law, Utah therefore has the most significant relationship to this contractual dispute.

¶34   Huntsman generally does not dispute that its principal place of business and the place of actual performance is Utah; rather, Huntsman attempts to minimize the importance of these combined contacts to Utah and, instead, argues that the principles underlying these contacts favor application of Texas law.  Huntsman emphasizes that it is a successor in interest to the original party that contracted with One Beacon for insurance coverage, El Paso Products, a Texas corporation.[12]  Huntsman thus argues that "at the time of contracting," the original contracting "parties could not have anticipated that insurance payments for claims arising at a Texas facility, [then] owned by a Texas corporation, . . . might be sent to Utah some 40 years later."  As a result, argues Huntsman, the actual place of performance and "the current residence of the parties does not add much meaningful consideration to the choice of law analysis" because it "is a mere fortuity" that One Beacon eventually fulfilled its contractual obligations to "a Delaware company that happens to have its principal place of business in Utah."[13]  Huntsman further asserts that the place of performance contact is less concerned with the place where actual performance ultimately occurs but is more appropriately focused "on the intended place of performance at the time of contracting."  *See id.* (providing that greater weight is given to the place of performance when it is known "at the time of contracting"); *Ace Rent-A-Car*, 580 F. Supp. 2d at 688 ("Where there is no express agreement as to the place of performance, it may be determined *according to the intent of the parties*, namely, *the intended place of the insurer's payment of claims under the policy*." (emphases added) (internal quotation marks omitted) (citing 2 Couch on Insurance 2d § 16:11, at 497 (rev. 1984))).  According to Huntsman, at the time of contracting, the original parties would have expected performance to occur in Texas because they would have anticipated that payment of any claim under the insurance policy would have been to El Paso Products at its place of business in Texas.

---

12.  As previously explained, *see supra* ¶ 5 n.1, One Beacon is also a successor in interest to the original contracting insurer.  However, One Beacon makes no argument concerning any comparable effect of its predecessor being the original contracting party.

13.  Huntsman also argues that the parties' place of incorporation and principal place of business do not cluster in Utah as exclusively as One Beacon portrays because Huntsman is a Delaware corporation and One Beacon is a Massachusetts corporation.

¶35    It is not irrelevant that Utah, as Huntsman's principal place of business, is the actual place of performance because Utah, as the place where the contract was actually performed, "has an obvious interest in the nature of the performance." *See* Restatement (Second) of Conflict of Laws § 188 cmt. e.  And we are mindful of One Beacon's position that we should construe these contacts by considering "where performance occurred in reality, as opposed to" making a "guess that the original parties to the insurance contracts . . . would have expected performance to occur in Texas."  However, as Huntsman points out, at the time of contracting, neither of the contracting parties could have reasonably foreseen that performance would someday occur in Utah. *See id.* ("[T]he place of performance can bear little weight in the choice of applicable law when . . . at the time of contracting it is . . . uncertain or unknown . . . .").  Rather, Texas would naturally have been the expected place of performance.  And the expected place of performance only changed decades later, long after the CGL policies had been issued and had expired.  Under the circumstances, to construe the related principal place of business and place of performance contacts as favoring application of Utah law would be to ignore the parties' intent at the time of contracting and would further contravene an important principle underlying any choice of law analysis arising in the context of a contractual dispute--to protect the justified expectations of the contracting parties. *See id.* § 6(2)(d) (explaining that one of seven overarching choice of law principles is "the protection of justified expectations"); *see also Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 13, 266 P.3d 733 ("The primary purpose of contract interpretation is to ascertain the intentions of the parties at the time of contracting." (internal quotations marks omitted)).  Thus, although there is a discrepancy between the intended place of performance at the time of contracting and the actual place of performance, we ultimately conclude that, on balance, these contacts tend to favor application of Texas law because at the time of contracting the parties would have expected claims under the policy to be paid to El Paso Products in Texas.

3. Location of the Contract's Subject Matter or the Location of the Insured Risk

¶36    Finally, we consider the location of the subject matter of the contract.  "When the contract deals with a specific physical thing . . . or affords protection against a localized risk, . . . the location of the thing or of the risk is significant" and the "state where the thing or the risk is located will have a natural interest in transactions affecting it." Restatement (Second) of Conflict of Laws § 188 cmt. e (1971).  "Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties . . . would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract." *Id.*

¶37    With regard to contracts for casualty insurance, however, section 188 refers to section 193, which specifically addresses disputes arising out of insurance contracts, such as the CGL insurance policy at issue here. *See id.* Section 193 provides that

> [t]he validity of a contract of . . . casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless . . . some other state has a more significant relationship . . . to the transaction and the parties.

*Id.* § 193. Comment b to section 193 goes on to explain that "[a]n insured risk, namely the object or activity which is the subject matter of the insurance, has its principal location . . . in the state where it will be during at least the major portion of the insurance period." *Id.* § 193 cmt. b.

¶38    Comment b further elaborates on the weight that should be afforded this contact, providing that "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law." *Id.*; *see also American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996) (acknowledging that section 193 provides that the "location of the insured risk applies to contracts of . . . casualty insurance" and makes "the risk's principal location . . . the most important contact to be considered in the choice of applicable law"). Comment b, however, also explains that the location of the insured risk should be accorded such significance only in circumstances where "the risk can be located, at least principally, in a single state." Restatement (Second) of Conflict of Laws § 193 cmt. b. In this regard, comment b acknowledges that there are "[s]ituations where [a single or principal location of the insured risk] cannot be [identified], and where the location of the risk has less significance, includ[ing] . . . where the policy covers a group of risks that are scattered throughout two or more states." *Id.* Nonetheless, comment f to section 193 recognizes the "special problem [that] is presented by multiple risk policies which insure against risks located in several states" and recommends "treat[ing] such a case . . . as if it involved [several] policies, each insuring an individual risk." *Id.* § 193 cmt. f; *see also id.* § 193 cmt. a (providing that comment f controls multiple risk policies by stating, "As to multiple risk policies, see [c]omment f").[14]

---

14. For example, under comment f to section 193, if "[a] single policy . . . insure[s multiple risks] located in states X, Y, and Z" and a covered risk occurs in state X, then

(continued...)

¶39 One Beacon does not engage in any meaningful analysis of section 193 but simply dismisses it as having no significance to the present analysis based on a very narrow reading of comment b's statement that the location of the insured risk "has less significance . . . where the policy covers a group of risks that are scattered throughout two or more states." *Id.* § 193 cmt. b. One Beacon thus argues that because it insured "risks [for El Paso Products] throughout the world . . . [t]he fact[] that the alleged exposure [to asbestos] in the underlying lawsuit took place in Texas and that [the wrongful death lawsuit was] filed in Texas are fortuities and are therefore irrelevant." In making this argument, One Beacon ignores other pertinent language in comment b, as well as comments a and f, which together require a much more nuanced approach to the location of the risk contact in the context of multiple risk policies, such as the one before us. *See generally id.* § 193 cmt. a (providing that comment f controls multiple risk policies); *id.* § 193 cmt. f (explaining how to identify the location of the insured risk in the context of multiple risk policies).

¶40 Generally, under section 193, the location of the insured risk is determinative in identifying the law that controls a dispute over a contract for casualty insurance. *See id.* § 193 (explaining that the law controlling a dispute over a contract for casualty insurance is "determined" by the location of the insured risk); *see also id.* § 193 cmt. b ("The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law . . . ."). However, according to comment b, the weight this contact merits will increase or decrease to the extent "that the risk can be located, at least principally, in a single state." *Id.* § 193 cmt. b. In a situation such as this where an insurance "policy covers a group of risks that are scattered throughout two or more states," the location of the insured risk can be of "less significance," but only to the extent that the particular risk in question cannot be located in a single state. *Id.* Comment f provides a simple method by which an insured risk can be located in a single state in the context of a multiple risk policy by treating the multiple risk policy "as if it involved [several] policies, each insuring an individual risk." *See id.* § 193 cmt. f. This approach is consistent with the overall goal of section 188 to identify the state with the most significant relationship to a contractual dispute because the "state where . . . the risk is located will have a natural interest in

---

14. (...continued)
"the rights and obligations of the parties under the policy" could be determined "in accordance with the local law of [state] X." Restatement (Second) of Conflict of Laws § 193 cmt. f (1971).

transactions affecting it," and it is reasonably "assumed that the parties . . . would expect the local law of the state where the . . . risk was located would . . . determine many of the issues arising under the contract." *See id.* § 188 cmt. e.

¶41    Under the circumstances of this case, the location of the insured risk, alone, is not determinative of the state with the most significant relationship to this contractual dispute because the CGL insurance policy at issue covers multiple risks located in several states.  However, this contact is nonetheless an important component of the most significant relationship analysis to the extent that the insured risk can be located in a single state, particularly if there is no other state with a more significant relationship to the contractual dispute.  In applying comment f here, it is apparent that the location of the insured risk can "be located, at least principally, in a single state." *See* Restatement (Second) of Conflict of Laws § 193 cmt. b (1971); *cf. Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.*, 580 F. Supp. 2d 678, 686-87 (N.D. Ill. 2008) (concluding that the location of the insured risk was not readily identifiable under the particular facts of the case based on the approach suggested by section 193 of the Restatement of Conflict of Laws because, unlike other cases involving a single act that occurred in a single place, the insured risk at issue was liability arising from "commercial advertising . . . [that was] not limited to one instance in one location").

¶42    The CGL insurance policy at issue here obligated One Beacon to indemnify El Paso Products for "all sums which [El Paso Products] . . . become[s] legally obligated to pay as damages because of . . . bodily injury . . . caused by an occurrence."  Although not the only risk or location covered, the parties contracted to cover a risk of "bodily injury . . . caused by an occurrence" at El Paso Product's facility located in Texas.  The insured risk of bodily injury that the parties anticipated might occur at the Texas facility did, in fact, occur when Whetsell allegedly inhaled asbestos fibers during his twelve-year employment at the Texas facility.  It is this risk of bodily injury that was contemplated by the insurance contract that is the heart of this dispute between the contracting parties.  Thus, in accordance with comment f to section 193, we treat the CGL insurance policy as if "insuring an individual risk" in Texas.  We therefore conclude that, under the facts of this case, the location of the insured risk is Texas.

¶43    One Beacon, however, takes issue with this approach, emphasizing that this dispute has been appropriately characterized as one of contract, *see supra* ¶ 27, and argues that considering the location of the risk, as we have done here, impermissibly allows the state with the most significant relationship to a contractual dispute to be determined based on contacts that are relevant only to a dispute sounding in tort,

namely the location of the underlying bodily injury or tort. *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 15, 54 P.3d 1054 (explaining that characterizing the nature of the underlying dispute to determine whether the issue sounds in tort or contract is an important preliminary step in resolving a conflict of laws question because the resulting analysis varies depending upon the type of action involved). *Compare* Restatement (Second) of Conflict of Laws § 145(1)-(2) (providing that in disputes sounding in tort, "the place where the injury occurred" and "the place where the conduct causing the injury occurred" are contacts that should be considered to determine the state with the most significant relationship to the dispute), *with id.* § 188(2) (listing several contacts--not including the location of the underlying bodily injury or tort--that should be considered to determine the state with the most significant relationship to a contractual dispute).

¶44     In making this argument, however, One Beacon misperceives the nature of the location of the insured risk contact. A CGL insurance policy insures against the risk of liability for bodily injury, and the injuries that trigger such coverage are typically the result of the conduct of the insured or its employees or representatives. Naturally, those injuries occur at locations identified in the policy that are covered by the insurance contract. That an anticipated location of an insured risk coincides with the place where an injury actually occurs is incidental; and the location of the insured risk contact does not transform into a location of the underlying tort contact by virtue of those two contacts being associated with the same place.[15] Further, it is expected that

---

15. It may be worth noting that, even as applied to contractual disputes, the location of the underlying tort or bodily injury is not a contact that is wholly irrelevant to the most significant relationship analysis; but when taken into consideration, it is not determinative and is of negligible weight. *See generally American Nat'l Fire Ins. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996) (holding that "[u]nder the most significant relationship test [as applied in contractual disputes], *the location of the accident is not sufficient to outweigh numerous other contacts*" (emphasis added)); *id.* at 189-90 (recognizing that "[o]ther jurisdictions have . . . rejected the site of the accident as the *determining* factor in choice of law questions," and collecting cases for the proposition "that the mere fact that an accident occurred in one state does not give that state the most significant relationship in an insurance contract dispute" because "*the location of the accident, standing alone, is not sufficient to outweigh the location of the vehicle, the place of contracting, and the residency of the parties*" (emphases added)).

(continued...)

Texas "will have a natural interest in transactions affecting" a risk that was located and that actually occurred within its boundaries, and it is also reasonable to "assume[] that the parties . . . would expect that" Texas law "would be applied to determine many of the issues arising under the contract" that concern such an injury. *See id.* § 188 cmt. e; *see also id.* § 6(2)(c)-(d) (listing other factors relevant to a choice of law analysis, such as "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue" as well as "the protection of justified expectations"). One Beacon's arguments on this matter are therefore unpersuasive.

4. Summary of Most Significant Relationship Analysis

¶45    Having considered the pertinent contacts under section 188, we conclude that Texas is the state with the most significant relationship to this contractual dispute. Because this case involves a multiple risk policy, the location of the insured risk is not wholly determinative here. Nonetheless, the location of the insured risk has considerable weight in the choice of law analysis because the insured risk "can be located, at least principally, in a single state," *see* Restatement (Second) of Conflict of Laws § 193 cmt. b (1971). That weight is enhanced because this is not a case where "some other state has a more significant relationship . . . to the [contract] and the parties" than Texas, *see id.* § 193. In particular, One Beacon has not persuaded us that Utah has a more significant relationship to this contractual dispute than Texas. Indeed, any relationship Utah has to this dispute as Huntsman's principal place of business and the actual place of performance is, in the end, fortuitous because those contacts only

---

15. (...continued)

In addition, although here the cost of defending against the wrongful death lawsuit is also covered by the CGL insurance policy, the location of the underlying lawsuit is of negligible importance in identifying the location of the insured risk because the insured risk is better identified by the occurrence that triggers coverage under the insurance contract rather than the place where litigation arising from that occurrence may subsequently be filed. *Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.*, 580 F. Supp. 2d 678, 686 (N.D. Ill. 2008) (explaining that the location of the insured risk is not equated with the location of the underlying action or lawsuit but, rather, the location of the insured risk has been identified by the location of the accident or injury out of which the lawsuit arose). Nevertheless, the location of the underlying lawsuit may be considered in the most significant relationship analysis, although it is a contact of minimal significance. *See id.* at 686-87.

arise from the purchase of El Paso Products by Huntsman decades after the CGL insurance policy was issued and after the active relationship between the contracting parties had dissipated. Those contacts to Utah therefore carry much less weight in the overall most significant relationship analysis.

¶46 In the end, we conclude that the place of negotiation and place of contracting contacts are indeterminative; the place of performance and principal place of business contacts indicate ties to both Texas and Utah but, ultimately, weigh in favor of Texas; and the location of the insured risk weighs in favor of Texas. We therefore conclude that the district court was correct in deciding that Texas has a more significant relationship to this dispute than Utah and, therefore, correctly applied Texas law to interpret the insurance contract.

¶47 We now turn to the question of whether the district court was correct in deciding that Texas law requires application of the exposure trigger theory under the circumstances of this case.

B. Application of the Exposure Trigger Theory Under Texas Law

¶48 One Beacon argues that, even if we conclude that the district court correctly applied Texas law to this dispute, the district court nevertheless erred in concluding that Texas law requires application of the exposure trigger theory to determine when coverage of a progressive disease is triggered under a CGL insurance policy. In support of its position, One Beacon cites *Don's Building Supply, Inc. v. OneBeacon Insurance Co.*, 267 S.W.3d 20 (Tex. 2008), where the Texas Supreme Court concluded that the CGL insurance policy at issue "does not support adoption of an exposure rule, at least not where . . . physical injury to tangible property [h]as [been] alleged." *Id.* at 29 (internal quotation marks omitted). The Texas Supreme Court thus "decline[d] to recognize a[n] . . . exposure rule for the property damage claims alleged under th[e] policy." *Id.* As these quoted portions of the decision suggest, however, the decision in *Don's Building Supply* was expressly limited to claims for property damage. *See id.* at 22-23, 29. The court, in fact, clearly stated multiple times that it "express[ed] no opinion on whether the coverage rule for determining if a claim occurs during the term of [a CGL insurance] policy is the same for bodily injury and property damage claims." *Id.* at 28 n.32; *see also id.* at 28 ("A related if not overlapping body of law, which we do not explore today, addresses when coverage is triggered on bodily injury claims under CGL and other policies."); *id.* at 28 n.29 ("[W]e express no view on whether the rule for determining the triggering of coverage is the same for bodily injury and property damage claims."); *id.*

at 26 n.23 ("[W]e express no view on whether the rule for determining the triggering of coverage is the same for bodily injury and property damage claims.").

¶49     In explaining that its decision did not "explore . . . when coverage is triggered on bodily injury claims under CGL and other policies," the court in *Don's Building Supply* cited without criticism *Guaranty National Insurance Co. v. Azrock Industries Inc.*, 211 F.3d 239, 243 (5th Cir. 2000) *overruled by OneBeacon Insurance Co. v. Don's Building Supply, Inc.*, 553 F.3d 901 (5th Cir. 2008), as an example of the application of the exposure trigger theory to bodily injury coverage. *See Don's Bldg. Supply*, 267 S.W.3d at 28 & n.32.  In *Azrock*, the Fifth Circuit recognized that "Texas courts ha[d] not squarely addressed the issue of the trigger of coverage in progressive disease cases" and endeavored to "make an *Erie* guess on this aspect of Texas law." *Id.* at 246.  After reviewing applicable Texas law, the court in *Azrock* "decline[d] to adopt the continuous trigger theory as the best *Erie* guess of what the highest Texas court would do if squarely faced with this issue" because at that time "no Texas court ha[d] ever adopted or implicitly endorsed the continuous trigger theory." *Id.* at 249 ("[A]dequate support [has not been presented] . . . to convince us that if a Texas court were faced squarely with the issue of the trigger of coverage in the progressive disease context, it would adopt the continuous trigger theory[ and w]e therefore decline to do so for Texas.").  The court in *Azrock* then concluded that its "best *Erie* guess as to what Texas would choose as the event that triggers" coverage "under a uniform CGL [insurance] policy" for bodily injury in the form of a progressive disease "is the exposure theory." *Id.* at 251-52.

¶50     The *Don's Building Supply* court also cited *Pilgrim Enterprises, Inc. v. Maryland Casualty Co.*, 24 S.W.3d 488 (Tex. App. 2000), *called into question by Don's Building Supply, Inc. v. OneBeacon Insurance Co.*, 267 S.W.3d 20 (Tex. 2008), in recognition that, there, the exposure trigger theory had been applied under Texas law to determine when coverage of "personal injury or property damage [is triggered] during the policy period." *Don's Bldg. Supply*, 267 S.W.3d at 27-28 & n.27.  In *Pilgrim*, the Texas Court of Appeals agreed with the *Azrock* decision that under "[CGL] policies covering continuous or repeated exposure to conditions, [the] injury . . . occur[s] as the exposure takes place." *Pilgrim*, 24 S.W.3d at 497-98 (emphasis omitted).  The *Pilgrim* decision extended that reasoning to property damage, determining that the exposure trigger theory was applicable to "both physical injury and property damage" under a CGL insurance policy.[16] *See id.*  To the

16.  The court in *Pilgrim* did this despite the court in *Azrock* explaining that, under Texas law, the manifestation trigger theory had typically been applied to property damage

(continued...)

extent that the *Pilgrim* decision applied the exposure trigger theory to property damage claims, it is likely overturned by the *Don's Building Supply* decision. *See Don's Bldg. Supply*, 267 S.W.3d at 29 (declining to recognize the exposure trigger theory for property damage claims under the particular insurance policy at issue). But as we have discussed, the court in *Don's Building Supply* explicitly declined to express any opinion on the coverage provided for bodily injury under similar policy language. *See id.* at 26 n.23, 28 & n.32, 28 n.29. Thus, to the extent that the *Azrock* and *Pilgrim* decisions apply the exposure trigger theory to bodily injury cases, those decisions likely remain unaffected by *Don's Building Supply*. Because the *Don's Building Supply* decision rejected the exposure trigger theory only in cases involving property damage claims, it has not overruled precedent applying the exposure trigger theory to progressive disease bodily injury cases under Texas law.

¶51    There is good reason for the Texas Supreme Court to emphasize that its decision in *Don's Building Supply* did not reach the issue of which trigger theory it would apply in bodily injury cases. In addition to the general distinction between property damage and bodily injury cases, progressive disease cases are recognized as being further distinguishable from ordinary bodily injury cases. *See supra* ¶ 12; *see also Azrock*, 211 F.3d at 247 (stating that distinguishing cumulative diseases from other kinds of bodily injury and property damage cases "is relevant" because "[c]umulative disease cases are different from the ordinary accident or disease situation," and treating cases where other trigger theories have been applied "in entirely different contexts, *particularly property damage cases*" as inapposite (emphasis added)); *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1214, 1216, 1218-19 (6th Cir. 1980) (rejecting the argument that progressive diseases be treated the same way as any other disease because "[c]umulative disease cases are different from the ordinary accident or disease situation" (emphasis omitted)). It therefore seems reasonable that the Texas Supreme Court was aware of the unique challenges presented by progressive disease cases and made a conscious and deliberate decision to commensurately limit the reach of its decision in *Don's Building Supply*.

¶52    Ultimately, we agree with the district court that "no Texas court has specifically adopted the continuous trigger theory . . . and only the exposure theory has been adopted with respect to . . . bodily injury claims." Although the issue has not been

---

16. (...continued)
cases. *See generally Matthews Heating & Air Conditioning LLC v. Liberty Mut. Fire Ins. Co.*, 384 F. Supp. 2d 988, 993-94 (N.D. Tex. 2004) (explaining the *Pilgrim* decision).

finally resolved by Texas's highest court, we see no reason to apply a different trigger theory than courts applying Texas law have previously applied in circumstances similar to the case before us. Accordingly, we conclude that the district court correctly determined that Texas law requires application of the exposure trigger theory when interpreting a CGL insurance policy to determine when coverage is triggered for bodily injury in the form of a progressive disease.[17]

---

17. Our decision here is also consistent with the widely-recognized contra proferentem doctrine, which provides that if an insurance policy "is susceptible of more than one reasonable interpretation, . . . the uncertainty [must be resolved] by adopting the construction that most favors the insured." *Guaranty Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243, 250 (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 667 (Tex. 1987)); *see also Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1041-42 (D.C. Cir. 1981) ("We are aided in our analysis of th[is as-applied ambiguous policy language] by the well-accepted rule that ambiguity in an insurance contract must be construed in favor of the insured."); *id.* at 1046 (rejecting interpretations that "would deprive [the insured] of the protection it purchased when it entered into the insurance contracts"); *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1221 (6th Cir. 1980) (stating that "insurance policies must be strictly construed in favor of the injured and to promote coverages"); *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) ("If . . . a[n insurance] contract is susceptible to more than one reasonable interpretation, we will resolve any ambiguity in favor of coverage.").

One Beacon and Huntsman dispute which trigger theory applies because of the resulting difference in coverage: if the continuous trigger theory is applied, One Beacon is only obligated to cover either 61% of 34% of the total defense costs and settlement; but if the exposure trigger theory is applied, One Beacon is obligated to cover 100% of the total defense costs and settlement. Inasmuch as the exposure trigger theory favors coverage in this case, such an interpretation of the ambiguous policy language is the preferable result under the contra proferentum doctrine. We emphasize, however, that because application of this doctrine has a distinct tendency to lead to result-oriented conclusions, its use is one of the reasons for the inconsistencies that plague this area of the law. For this reason, we do not rely on the contra proferentum doctrine as a basis for our decision but simply acknowledge that its application is consistent with the decision we have already reached.

## CONCLUSION

¶53    As the intended place of performance at the time of contracting and the location of the insured risk, Texas has the most significant relationship to this dispute.  As the state with the most significant relationship to this dispute, Texas law applies and requires application of the exposure trigger theory to determine the bodily injury that triggers the coverage provided by the CGL insurance policy in the context of a progressive disease.  Because the exposure trigger theory applies here, One Beacon is required to fully indemnify Huntsman for 100% of the defense costs and settlement of the wrongful death lawsuit.  We therefore conclude that the district court correctly granted Huntsman's motion for summary judgment.

¶54    Accordingly, we affirm.

_____
Stephen L. Roth, Judge

-----

¶55    WE CONCUR:

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

_____
William A. Thorne Jr., Judge